In the Matter of John and Edna **BURKEY,** and S.T. and Patricia Patrick, Debtor(s).

**S.T. PATRICK, Patricia Patrick, John Burkey, and Edna Burkey, Plaintiffs,**

v.

**PHOENIX STRATEGY CORPORATION, et al., Defendants.**

Bankruptcy Nos. 85–3520, 85–3521. Adv. No. 86–28.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Dec. 18, 1986.

Jeffrey Warren, 220 S. Franklin St., Tampa, Fla., for S.T. Patrick & N. Patricia Patrick & John D. Burkey & Edna Burkey.

Francis H. Cobb, Tampa, Fla., Thomas J. Gallo, Co-Counsel, Atlanta, Ga., for Phoenix Strategy, Capital Sunbelt Investors, Michael Berndt, & Frank Chamberlain.

Peter J. Hobson, Tampa, Fla., for James, Dorotha, Thomas & Charles Weprin & Individual Retirement Account.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THE MATTER under consideration is a consolidated adversary proceeding instituted by S.T. Patrick and N. Patricia Patrick, Debtors in Chapter 11 Case No. 85–3521 (Patricks) and by John and Edna Burkey, Debtors in Chapter 11 Case No. 85–3520 (Burkeys) (referred to collectively as Debtors). On December 3, 1985, the Debtors filed separate Petitions for Relief under Chapter 11 of the Bankruptcy Code and on January 23, 1986, filed separate Complaints, which were later consolidated into this five-count Complaint, seeking (1) turnover of estate property under § 542(a) of the Bankruptcy Code, (2) turnover of estate property by a custodian under § 543 of the Bankruptcy Code, (3) a declaration of rights regarding estate property, (4) the avoidance of a fraudulent transfer pursuant to § 548 of the Bankruptcy Code, and (5) the avoidance of a preferential transfer pursuant to § 547 of the Bankruptcy Code. Named as defendants in the consolidated adversary proceeding were Phoenix Strategy Corporation (Strategy) and its president, Michael C. Berndt (Berndt), Capital: Sunbelt Investors Protection Corporation, (CSIPC) and individual investors in a limited partnership known as Capital: Maple Leaf Estates, Ltd. (CMLE). The facts relevant to the issues under consideration as they appear from the record established at the final evidentiary hearing are as follows:

In August 1981 the Debtors organized a Florida corporation called Capital: Sunbelt Investments, Inc. (Investments). All of the stock of Investments was owned by the Debtors in equal shares. In 1984, the Debtors formed a holding company known as Capital: Sunbelt Investments Group, Inc. (Group), and contributed all of their stock in Investments and other related corporations to Group in return for all of Group's issued and outstanding shares. Each of the Debtors received 1,000 shares of common stock in Group.

The principal, and as far as it appears, the only business of Investments was the acquisition of adult mobile home parks, recreational vehicle facilities, and other similar-type income-producing properties.

The basic concept of all these acquisitions involved the formation of two limited partnerships; one referred to as "A–Side", the other as the "B–Side" partnerships. Under this scheme, the A–Side partnership acquired a tract of land with funds raised from the sale of securities to the public in the form of interests in the limited partnership. The A–Side partnership then leased the properties acquired to the B–Side partnership, which in turn purchased and maintained all improvements to the land and actually operated the project in question. Investments served as the sole general partner in both limited partnerships. The basic concept of these investment schemes was that the investors in the B–Side partnership could reduce their tax liability by deducting the operating expenses of the project, but most importantly, take advantage of the operating losses which might occur. The tax advantage to the investors in the A–Side project was based on the proposition they could depreciate the properties acquired by the partnership and deduct the depreciation from their taxable income derived from the other sources.

In April 1985, Investments entered into a contract to purchase a mobile home park called Maple Leaf Estates Mobile Home Rental Park (Maple Leaf Estates). In order to accomplish this, Investments formed an A–Side partnership called Capital: Maple Leaf Estates, Ltd. (CMLE) and a B–Side partnership called Maple Leaf Estates, Ltd. (M.L. Ltd.) The selling agent for the shares of the A–Side partnership, CMLE, was an Atlanta-based registered securities broker/dealer, Phoenix Financial Services, Inc., which sold limited partnership interests to a large number of investors in CMLE. Phoenix is an affiliate of the Peterson Wealth Management Company, which is a sole proprietorship owned by J. Chandler Peterson (Peterson) of Atlanta. Peterson also owns all of the stock in Phoenix Management Corporation (Management) and in J. Chandler Peterson Wealth Planning, Inc. The entities owned by Peterson will be referred to in this opinion collectively as the Peterson Companies.

From May 1985 through September 1985 investors in CMLE contributed more than 2.6 million dollars for the purpose of acquiring the property known as Maple Leaf Estates. Investments deposited some of these monies in an interest bearing account, but then borrowed approximately 1.35 million from the funds, intending to repay the loan at the closing of the Maple Leaf Estates purchase. It appears, however, that the CMLE partnership agreement contained an absolute prohibition against loans to the general partner, i.e. to Investments. In August 1985, counsel for Group and Investments informed the Debtors and the general partners of Investments and owners of all outstanding shares and their respective wives in the parent of Investments and in Group that the loans to Investments by them was a serious Securities Exchange Commission violation. Upon learning that the loan was, in fact, prohibited by the partnership agreement and was also an SEC violation, the Debtors attempted to raise funds necessary to repay the loan prior to the Maple Leaf Estates closing, but were unable to do so. Due to the SEC problem, at least in part, the Maple Leaf Estates purchase was never consummated, and of course without the funds that were to be paid at the closing, Investments could not repay the loan from CMLE.

In early October 1985, Mr. Burkey, one of the Debtors, contacted Berndt, one of the Defendants, who at that time was president of Phoenix and who also held other positions within the Peterson Companies, and advised him of the problem which surfaced in connection with the Maple Leaf Estates acquisition. On October 6, 1985, three Peterson Company employees, Berndt, Tom Ratliff (Ratliff), a vice-president of Management, and Tim Nichols (Nichols) came to Lakeland, Florida, the residence of the Debtors, and met with them and other employees of Group and Investments. After reviewing the financial records of Investments, the three returned to Atlanta on October 8. Later in that same week Berndt contacted the Debtors and requested that they come to Atlanta on

October 12 to meet with Peterson Company employees and discuss a possible resolution of the CMLE problems. On Saturday, October 12, Mr. Burkey and Mr. Patrick arrived at the Peterson Company offices and met with Peterson, Berndt, Ratliff, and other Peterson Company employees. The individuals present at that meeting offered contradictory testimony as to what actually happened at that meeting and what the parties intended to accomplish through the documents prepared by the Peterson Companies and signed by the Debtors. It is without dispute, however, that at or shortly after the meeting, the Debtors executed numerous documents, which not only ousted them from control of Investments and Group, but also served to strip them of essentially all of their personal assets. The documents prepared by the Peterson employees and signed by the Debtors include the following:

1. A letter dated October 12, 1985, signed by Mr. Burkey and Mr. Patrick and addressed to Berndt, in which the Debtors refer to the financial difficulties of Investments and the "jeopardy" of CMLE and acknowledged the withdrawal of monies from CMLE. The letter further states that "in an attempt to make those investors whole," the Debtors were transferring all their personal assets, including the stock in Group and its subsidiaries and affiliates, to an entity known as Phoenix Strategy Corporation (Strategy), a corporation that was yet to be formed. The letter further states that:

> You [Strategy] undertake no obligation whatsoever to us [the Debtors], to the transferred corporation [Group], or to any of its partnerships or the investors.... On request by you or any authorized representative of the corporation or the partnerships, we will execute such further documents, make such further transfers, and take such further actions as are appropriate to fully vest all assets and rights owned or controlled by us in [CMLE].

2. General Assignments dated October 12, 1985, executed by Mr. Burkey and Mr. Patrick, and Spousal General Assignments, executed by their wives, in which the Debtors assigned to Strategy all their personal properties and all their interest in real properties, including their respective residences, specifically their ownership interest in all the corporate stock in Group.

3. Powers of Attorney executed by the Debtors designating Berndt as their true and lawful attorney in fact.

4. Resignations of the Debtors as directors and officers of Investments and Group, limiting their effectiveness until their delivery to Strategy pursuant to the terms of an Escrow Agreement.

5. An Escrow Agreement by and between the Debtors, CMLE, Strategy, naming Berndt as escrow agent, in which Berndt was to hold the General Assignments, Spousal General Assignments, and resignations of the Debtors until Strategy had an opportunity to investigate all matters involving activities of the Debtors and CMLE. The Escrow Agreement specifically provided that the properties transferred were to be held in escrow until such time as Strategy determined to accept the General Assignments, Spousal General Assignments, and their resignations, and sent a notice by registered or certified mail to the escrow agent, Berndt, advising him that it had determined to accept the properties transferred. Notice was to be effective, if and only if, it was transmitted by certified or registered mail to specific addresses listed within the Escrow Agreement.

It is without dispute that Strategy was not formed until October 15, 1985, after all the documents were executed by the Debtors. It is also without dispute that Strategy was created for the sole purpose of acting as a receiver of all the property transferred by the Debtors. On October 15, 1985, Berndt went to Lakeland, Florida, where the Burkeys endorsed their Group stock certificates in blank and delivered them to Berndt. On October 16, 1985, the Patricks also endorsed their certificates and delivered them to Berndt. Berndt returned to Atlanta, but other Peterson Company employees who had also arrived in

Lakeland on October 15 remained at the Investment offices and began a review and to analyze the affairs of the various partnerships involved with Group and Investments.

On October 18, 1985, counsel for the Debtors notified the Peterson Companies that the Debtors desired to rescind the Powers of Attorney, the General Assignments and Spousal General Assignments, the Escrow Agreement, and the stock transfers, and desired to terminate the relationship between Group and Strategy. The Debtors executed and recorded Revocations of Powers of Attorney, but the stock certificates, which had been endorsed in blank, were not returned by Berndt. None of the documents which would be necessary to transfer the Debtors' real property or their automobiles, as contemplated by the General Assignments and Spousal General Assignments, were ever executed.

The Debtors filed their Petitions for Relief under Chapter 11 in this Court on December 3, 1985. On January 7, 1986, Capital: Sunbelt Investments Protection Corporation (CSIPC) was incorporated under the laws of the State of Georgia. The incorporator and president of CSIPC is Frank Chamberlain (Chamberlain), a CMLE investor. The Articles of Incorporation of CSIPC have special provisions which *inter alia* (1) state that the corporation was formed to receive, hold and own the certificates as well as the personal assets of the Debtors, (2) restate the transfer by the Debtors to Strategy as assignee for the benefit of the investors of CMLE, (3) to provide for an indemnification and waiver of claims against its employees and agents and particularly a waiver of claims against Strategy and its officers, directors, agents, employees and affiliates, (4) to provide for appointment of Strategy to act on behalf of CSIPC, and (5) to empower Strategy to act in its sole discretion for CSIPC.

On January 7, 1986, after the Debtors had filed their respective Petitions under Chapter 11, Strategy assigned and transferred the stock certificates of Group to CSIPC by a document entitled "Stock Transfer Powers," executed by Berndt as president of Strategy and Ratliff as secretary of Strategy. It is important to note that Strategy never gave to Berndt the written notice of the acceptance of the assignments which was required by the Escrow Agreement. At this time the stock previously owned by the Debtors is the sole asset of CSIPC, and Chamberlain, as president of CSIPC, in fact, has actual possession of the stock certificates.

These are the basic and relevant facts on which the Debtors based their claim that they are entitled to the relief sought in their Complaint. The primary relief sought by the Debtors is the return of the stock certificates of Group which they have executed in blank and delivered to Berndt in October 1985. The alternative legal theories on which they base their claim that they are entitled to a return of the stock are set forth in five separate counts. Count I is for a turnover of estate property under § 542(a) of the Bankruptcy Code. Count II is for turnover of estate property by a custodian under § 543 of the Bankruptcy Code. Count III seeks a declaration of rights regarding estate property. Count IV is the avoidance of a fraudulent transfer pursuant to § 548 of the Bankruptcy Code. Count V is for the avoidance of a preferential transfer pursuant to § 547 of the Bankruptcy Code.

At the conclusion of the final hearing based on the evidence presented, this Court announced that the claim of the Debtors asserted in Count II shall be dismissed for lack of proof in its entirety, and the claim set forth in Count I also shall be dismissed as to all Defendants except Defendant Chamberlain, who concededly has actual physical control of the stock certificates involved in this controversy. The Court also announced that the claim of fraudulent transfer of the stock certificates set forth in Count IV of the Complaint shall also be dismissed as to all Defendants with the exception of Defendants Strategy and CSIPC.

Count I of the Complaint is based on § 542(a) of the Bankruptcy Code, which provides that:

> Except as provided in sub-section (c) or (d), of this Section, an entity, other than a custodian, in possession, custody, or control during the case, of property that the trustee may use, sell, or lease under § 363 of this Title, or that the Debtor may exempt under § 522 of this Title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequencial value or benefit to the estate.

Section 541 of the Bankruptcy Code defines property of the estate as "all legal and equitable interest of the Debtor in the property as of the commencement of the case".

■ The question which must be answered considering the claim set forth in Count I is whether the stock certificates were on the date the Debtors filed their Petitions, property of the estate, or whether the Debtors had transferred all their legal and equitable interest in the stock certificates before the Chapter 11 Petitions were filed.

To resolve this issue it is necessary to look to Florida law governing transfer of securities. Chapter 678 of the Florida Statutes, which governs investment securities, provides that the transfer of legal title to a security requires only that the stock certificate be endorsed and delivered to the transferee. Fla.Stat. §§ 678.301(1), 678.307, and 678.309, when read *in pari materia*, leads to the conclusion that when the Debtors endorsed the securities and delivered them to Berndt, the Debtors effectively transferred legal title to the certificates in October 1985 and the certificates were no longer properties of the estate when the case was commenced. Based on the foregoing, this Court is satisfied that the Debtors have failed to establish with the requisite degree of proof their claim set forth in Count I of the Complaint, simply because the stocks in question were no longer property of the estate on the date of the commencement of this case, and therefore, cannot be subject to the turnover provisions of either § 542 or § 543 of the Bankruptcy Code.

This does not mean, however, that the transfer of the corporate stock involved in this controversy is necessarily valid and not vulnerable to attack by the Debtors. The conclusion noted earlier that the stocks were effectively transferred pursuant to the applicable securities law does not necessarily foreclose the possibility that the transfers were, in fact, either fraudulent or preferential or voidable on some other ground, either pursuant to the provisions of the Bankruptcy Code § 547, § 548, or based on State Law Chapter 726 Fla.Stat.

■ This leaves for consideration the claim of the Debtors set forth in Count V of their Complaint in which they seek the avoidance of the stock transfer pursuant to § 547(b) of the Bankruptcy Code. In order to avoid a transfer under this section, it is the burden of the Debtors to establish that:

(1) there was a transfer during the prohibitive period, i.e., 90 days prior to the commencement of the case;

(2) it was made to or for the benefit of a creditor;

(3) for or on account of an antecedent debt;

(4) that the effect of the transfer was that the transfer received more than would have received in a Chapter 7 case; and

(5) the transfer was made while the Debtor was insolvent.

It is clear that at the time of the transfer there was no creditor/debtor relationship between the Debtors and the recipient of the stock, i.e., Strategy, and the ultimate recipient of the transfer, the investors in CMLE. While it might be contended that the Debtors were potentially liable to these investors for an alleged violation of Securities Laws and Regulations, this potential and certainly disputed claim cannot be characterized as an antecedent debt contemplated by this action. Applying these requirements to the facts as established by this record, there is no question that the claim of a voidable preference of the Debt-

ors also has not been established by the facts presented. From all this it follows that the claim of voidable preference shall be dismissed as to all Defendants.

The Debtors in Count III of their Complaint seek a declaration of their rights under certain documents which were executed by them in October 1985 in Atlanta, Georgia, specifically the Escrow Agreement, the General Assignments, and the Spousal General Assignments, all of which basically formed the basis for the transfer of the Group stock certificates. The transfer of the Group stocks by the Debtors was governed by the General Assignments and the Spousal General Assignments executed by the Debtors and the Escrow Agreement entered into on October 12, 1985, by the Debtors, CMLE, Strategy, and Berndt, as escrow agent. In addition, pursuant to the General Assignments and Spousal General Assignments, the Debtors assigned to Strategy all their real and personal properties, including their stockholdings in Group, and agreed to execute all documents necessary to affect such transfers. The Group stocks were endorsed in blank by them and in accordance with this Agreement, they were delivered to Berndt as escrow agent.

Even before discussing the validity of the General Assignments and Spousal General Assignments, it is important to note at the outset that Berndt without doubt violated the terms of the Escrow Agreement by transferring to Strategy the stocks he held in escrow without receiving from Strategy a Notice of Acceptance of the General Assignments and Spousal General Assignments. The Escrow Agreement specifically required the delivery of the certificates by Berndt not until Strategy sent notice of acceptance by certified or registered mail. Without this notice of acceptance, Berndt had no authority to release any of the documents held by him under the Escrow Agreement.

This breach of the Escrow Agreement is not, however, the most serious flaw in the transaction and obviously would not furnish any solace to the Debtors. This is so because this particular provision was evidently inserted for the benefit of Strategy and not for the benefit of the Debtors. It is the most elementary principle of contract law that in order to form a valid contract, there must be a mutuality of obligation between the parties to the contract. In other words, only the presence of valuable consideration on both sides of the bargain will make an executory bilateral contract fully enforceable. See 11 Fla.Jur.2d, Contracts §§ 52–76 and cases cited therein.

■ After careful examination of these General Assignments and Spousal General Assignments, this Court is satisfied that the General Assignments and Spousal General Assignments are not enforceable contracts because the assignee, Strategy, was under absolutely no obligation to suffer any legal detriment or confer any legal benefit upon the Debtors in exchange for the assignment of all their real and personal property holdings. The Debtors received no payment of money or exchanges of tangible or intangible property in return for the assignment of all their properties. Although Berndt and Ratliff both testified that the consideration for the assignments was that the Peterson Companies would help the Debtors work out their problems with the CMLE project, and that the Peterson Companies had, in fact, begun to offer such assistance to the Debtors when they tried to rescind the Agreement, this record is devoid of any evidence which indicates that Strategy or any of the Peterson Companies were committed to the undertaking which would have meaningfully benefited the Debtors. In fact, a letter prepared by the Peterson Companies, addressed to Berndt as representative of Strategy, and signed by Mr. Burkey and Mr. Patrick specifically stated that Strategy was accepting the transfer of stock as an accommodation to the Debtors and that the Peterson Companies undertook "no obligation whatsoever" to the Debtors, to Group, or to any of Group's partnerships or investors in any entities controlled by the Debtors. Moreover, even if, as Strategy argues, Strategy was obligated to take actions to solve the serious financial and management prob-

lems confronting Group and Investments, an assertion which is not supported by this record, this consideration undoubtedly would flow to the stockholders of Group and Investments, not to the Debtors. This is so because the October 1985 transfers had been assigned to Strategy, and it was Strategy's obligation to the Debtors, if it ever existed, to benefit Strategy and not the Debtors.

Based on the foregoing, this Court is satisfied that the October 1985 General Assignments, Spousal General Assignments, and Escrow Agreement are not enforceable agreements because of the total lack of consideration and that the Debtors are entitled to rescind the transaction in toto, including the transfer of the Group stock.

■ However, this is not the only ground which would warrant the finding that the Debtors are entitled to recover the stocks transferred. This is so because the Debtors have also carried their burden of proof on their claim set forth in Count IV of the Complaint, the claim of fraudulent transfer pursuant to § 548 of the Bankruptcy Code.

Section 548 of the Bankruptcy Code provides, in pertinent part, that:

(a) the trustee may avoid any transfer of an interest of the Debtor in property, or any obligation incurred by the Debtor, that was made or incurred on or within one year before the date of the filing of the Petition, if the Debtor voluntarily or involuntarily—

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

Actual fraudulent intent is not necessary to avoid a transfer as fraudulent under § 548 if, within one year of the filing of the Petition, there is a transfer for less than reasonable equivalent value by an insolvent debtor. *See i.e., In re Energy Savings Center, Inc.,* 54 B.R. 100 (Bankr.E.D.Penn.

1985); *In re Ear, Nose & Throat Surgeons of Worcester,* 49 B.R. 316 (Bankr.D.Mass. 1985).

This record leaves no doubt that the transfer and the delivery of the stock occurred within one year of the date on which the Debtors' Voluntary Petition for Relief was filed. While there may have been some question as to whether the Debtors were insolvent before the transfer, there is hardly any doubt that they were rendered insolvent as a result of the transfer. In this connection it should be pointed out that by the specific terms of the Agreements signed by the Debtors in Atlanta, including the Spousal General Assignments and Escrow Agreement, these Agreements would have stripped the Debtors of their earthly possessions, including all personal belongings, had the provisions of these Agreements been carried out in full pursuant to the terms. There is hardly any doubt that as a result the Debtors would have been rendered utterly destitute without any assets of any sort or of any kind. In light of these undisputed facts, to contend that the transfers did not render them insolvent is a proposition specious at least, and certainly totally devoid of any evidentiary support.

The remaining question is whether the Debtors received less than reasonably equivalent value for the stocks. This Court already concluded, *supra,* that the Debtors did not receive any consideration whatsoever for the transfer of stock. Thus, this element of a fraudulent transfer claim under § 548 of the Bankruptcy Code also has been established.

In opposing the claim of the Debtors, Strategy contends that the reasonably equivalent value standard of § 548 presupposes that the transferred property has a value, and if the value of the transferred property is zero, even a transfer in exchange for peanuts cannot be avoided as fraudulent under § 548(a)(1). In this connection Strategy urges that the Debtors did not sustain their burden of proving the Group stocks had value at the time of the transfer and, in fact, asserts that the Group stock was worthless at the time of

transfer. Strategy urges that a financial analysis in evidence indicates that Group's liabilities exceeded its assets on the date of the transfer, and that Group was insolvent on October 16, 1985, by at least $179,154.00.

Even if this Court were to accept the analysis relied on by Strategy, the fact that Group was not able to pay its debts as they became due or even that Group may have been insolvent by a balance sheet test at the time of the transfer does not necessarily render the stock of Group worthless. The Debtors presented clear and convincing evidence that there was substantial equity in Group stock on October 16, 1985, the date the delivery of the certificates to Berndt was completed. It is puzzling indeed why Strategy fought so hard to fend off the attack on the stock transfer by the Debtors if they considered and they believed that the stocks it received were worthless.

This Court is satisfied that the Group stock had substantial value at the time of the transfer, that the Debtors received less than its reasonably equivalent value in exchange, and that they are, therefore, entitled to recover the stock as a fraudulent conveyance pursuant to § 548 of the Bankruptcy Code.

Based on the foregoing, this Court is satisfied that the Debtors have prevailed on Count III and Count IV of their Complaint and are entitled to a reconveyance of all Group stock certificates.

A separate final judgment shall be entered in accordance with the foregoing.