**In re REDMAN OIL COMPANY, INC., Debtor.**

**Bankruptcy Nos. 2–88–03704, 33–0835635.**

United States Bankruptcy Court, S.D. Ohio, E.D.

Dec. 21, 1988.

■■■■■■■

Raymond P. Cunningham, A. Brian Dengler, and Arter & Hadden, Columbus, Ohio, for Redman Oil Co., Inc., debtor and debtor in possession.

Robert J. Sidman, John K. Keller, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for Jack Saltz and Lawrence and Selma Ruben.

Charles M. Caldwell, Office of the U.S. Trustee, Columbus, Ohio, Asst. U.S. Trustee.

## OPINION AND ORDER ON MOTION FOR TURNOVER

R. GUY COLE, Jr., Bankruptcy Judge.

### I. *Preliminary Statement*

This contested matter presents the issue of whether a state court-appointed receiver should be required to turn over operations of certain oil and gas wells to the debtor in possession pursuant to 11 U.S.C. § 543. Resolution of this question requires an interpretation of the term "custodian" contained in 11 U.S.C. § 101(10) and an examination of the elements which must be pleaded and proved to support turnover under § 543 of the Bankruptcy Code.

Jurisdiction over this case is vested in the Court pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This turnover proceeding is a core matter which the Court is empowered to hear and determine in accordance with 28 U.S.C. § 157(b)(2)(E). The following opinion and order shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

### II. *Factual Background*

An involuntary petition was filed against Redman Oil Company, Inc. ("Redman" or "Debtor") on July 22, 1988. Redman consented to the entry of an order for relief under Chapter 11 of the Bankruptcy Code on November 9, 1988. In 1984 and 1985, Redman entered into a series of contracts with Jack Saltz and Lawrence and Selma Ruben ("Saltz/Ruben") relating to an oil and gas drilling program in Morgan County, Ohio. Under these contracts, Saltz and/or Ruben obtained 60% of the working interest in the following oil and gas wells (the "Wells") in Morgan County:

1. Sherlock–Scott # 1
2. Swank–Wortman # 1
3. Dale Greer # 1
4. Clarence Hess # 1
5. Owen G. Reed # 1
6. Willey–Binion–Hook # 1
7. Clarence B. Willey # 1
8. Scott–Mahoney # 1

Redman owns a minority working interest in some of the Wells. The contracts which were executed by and between Redman and Saltz/Ruben are summarized in the chart below:

| Date | Investor | Number of Wells | Percentage Working Interest | Investment |
|---|---|---|---|---|
| 09/24/84 | Saltz | 5 | 60% | $750,000 |
| 12/01/84 | Saltz | 1 | 60% | $150,000 |
| 12/20/84 | Ruben | 1 | 60% | $150,000 |
| 02/25/85 | Saltz | | 30% | $ 95,000 |
| 02/25/85 | Ruben | 1 | 30% | $ 95,000 |

Redman leased the land upon which the Wells are situated from Ohio Power Company and Franklin Real Estate Company (collectively referred to as "Ohio Power"). The Oil and Gas Lease executed by and between Redman and Ohio Power (Redman Ex. 2) contains the following stipulation (the "Assignment Clause"):

No assignment of this Lease or any interest or right granted hereunder may be made without the prior written consent of the Lessor except that Lessee may make assignments of working interests and overriding royalties *provided that at all times, Lessee shall be primarily responsible for all aspects of the operation of the well for which said assignments are made.*

Redman Ex. 2 at 16 (emphasis added).

The contracts between Redman and Saltz/Ruben include a Development Agreement and an Operating Agreement. The Operating Agreements contain the follow-

ing language (the "Replacement Provision"):

> Should a sale be made by the OPERATOR of all its rights and interest, or should SALTZ [or RUBEN] wish to replace the OPERATOR, SALTZ [or RUBEN] shall have the right to select a new OPERATOR within sixty (60) days after the date of such sale or notification of election to replace. In the event OPERATOR sells all its rights and interest and a new OPERATOR is not so elected, the transferee of the present OPERATOR subject to the permission of SALTZ [or RUBEN] shall assume the duties of and act as OPERATOR. In either case, the retiring OPERATOR shall continue to serve as the OPERATOR, and discharge its duties in that capacity under this Agreement, until its successor OPERATOR is selected and begins to function, but the present OPERATOR shall not be obligated to continue the performance of its duties for more than one hundred twenty (120) days after the sale of its rights and interests has been completed.

The Replacement Provision is identically worded in each of the five Operating Agreements executed by and between Redman and Saltz and/or Ruben. In four of the Operating Agreements, the Replacement Provision is typewritten as it appears above. There is, however, some variance in the form of the Replacement Provision as it appears in the September 24, 1984 Operating Agreement—the initial Operating Agreement entered into by these parties. In Redman's version of the Operating Agreement (Redman Ex. 11), the Replacement Provision contains handwritten interlineations and the initials of Saltz in the margin; Saltz/Ruben's version (Saltz Ex. C) likewise contains interlineations, but additionally includes typewritten alterations and the initials of both Saltz and Howard Atha, Redman's president. Despite the aforedescribed differences in the parties' versions of the initial Operating Agreement, the Replacement Provision's language is identical in those two documents and in the other four Operating Agreements.

In December of 1987 Saltz/Ruben notified Redman by letter that, pursuant to their rights under the Replacement Provision, they were replacing Redman as operator with Eagle Mountain Energy Corporation ("EME"). Redman disregarded Saltz/Ruben's replacement notification, refused to turn over the books and records regarding the Wells to Saltz/Ruben or EME, and apparently continued its operation of the Wells in defiance of the notification. In early 1988, litigation concerning the Wells was commenced against Redman by Saltz/Ruben in the Court of Common Pleas of Morgan County, Ohio. On March 29, 1988, the Morgan County Common Pleas Court appointed EME as receiver to operate the Wells. The Order Appointing Special Receiver entered by the Morgan County Common Pleas Court (Saltz Ex. F) defines the powers and duties of EME in the following manner:

> [EME] is, placed in possession of said Wells, together with the transmission facilities up to the gathering line related thereto and all monies paid or to be paid by the purchaser's production from said wells; ... and it hereby is, authorized and directed to operate said wells in a reasonable and conservative manner and to pay all necessary operating expenses (including an operating and administrative fee to be paid to the receiver of $250 per well per month) to be paid out of the production monies collected ... and ... is, authorized and directed to deposit all additional monies collected into an interest-bearing trust account with an established banking institution, and to notify this court, in writing, with a copy to the parties to this action, of the account number, depository and amount so deposited, within ten days of making each deposit, and to hold said monies in deposit pending further order of this court; ....

Saltz Ex. F at 1–2. Following the appointment of EME, Redman continued marketing the gas produced from the Wells. Redman transported the gas to its customers by way of its own pipeline, which is the only pipeline presently capable of transporting the gas produced from the Wells. Oil produced from the Wells was sold to

Quaker State Oil Refining Corp., which, in June of 1988, was directed by EME to pay all royalties attributable to the working and overriding royalty interests directly to EME. In August of 1988, upon learning that Redman was refusing to disburse oil and gas royalties to interest holders, EME obtained authority from the Morgan County Common Pleas Court to "shut in" the Wells. The Wells have remained shut in since August 8, 1988. EME believes that with the onset of winter it is imperative to recommence operation of the Wells. EME hopes to obtain permission to transport gas through Redman's pipeline to the East Ohio line. If permission is not granted, and assuming EME is not ordered to turn over operation of the Wells to Redman, it contemplates constructing its own pipeline to transport and market gas without the necessity of using Redman's pipeline.

### III. *Arguments of the Parties*

The issues before the Court were presented by way of Redman's Motion to Compel Custodian Eagle Mountain Energy Corporation to Turn Over Property ("Motion") and the opposing memorandum filed by Saltz/Ruben. This contested matter was heard by the Court on an expedited basis on November 22, 1988. Post-hearing memoranda were received by the Court, following which the record was closed and the matter was taken under advisement.

According to Redman, 11 U.S.C. § 543 clearly mandates immediate turnover to it, as debtor in possession, of the right to operate the Wells. The right to operate the Wells granted by the Operating Agreements is a contract right, which, Redman reasons, is property of the Debtor subject to turnover.[1] Redman argues that the issues before the Court are more narrowly limited than suggested by Saltz/Ruben. It submits that the question of whether its operating rights were terminated prepetition by Saltz/Ruben's invocation of the Replacement Provision is not properly deter-

minable in the context of the instant Motion. Rather, Redman believes the termination issue, together with the underlying contractual dispute, should be decided in a state court proceeding following litigation on the merits.

Saltz/Ruben have framed a three-tiered rejoinder to Redman's Motion, arguing as follows:

(1) EME is not a custodian within the meaning of 11 U.S.C. § 101(10) and is, therefore, not subject to § 543's turnover requirements;

(2) Because the property for which turnover is sought—the contractual right to operate the Wells—ceased to be property of the estate under 11 U.S.C. § 541, it is not subject to turnover; and

(3) Ordering turnover of the right of operation of the Wells would be a vain act since Redman's operation of the Wells could be terminated at Saltz/Ruben's pleasure if the Operating Agreements were ultimately assumed by Redman under 11 U.S.C. § 365.

The respective contentions of the parties shall be addressed below.

### IV. *Discussion*

#### A. *Applicability of § 543: Is EME A Custodian?*

Redman's Motion is brought under § 543 of the Bankruptcy Code. Section 543 provides in relevant part as follows:

(a) A custodian with knowledge of the commencement of a case under this title concerning the debtor may not make any disbursement from, or take any action in the administration of, property of the debtor, proceeds, product, offspring, rents, or profits of such property, or property of the estate, in the possession, custody, or control of such custodian, except such action as is necessary to preserve such property.

(b) A custodian shall—

(1) deliver to the trustee any property of the debtor held by or transferred to

---

1. Debtor's Motion does not present the classic case of turnover typically handled by this Court —*i.e.*, where a party seeks turnover of tangible property. Here, Debtor requests turnover of an intangible contract right—the right to operate the Wells. In many respects, then, the Motion is conceptually similar to a motion for relief under 11 U.S.C. § 365 inasmuch as Debtor is seeking to exercise claimed contractual rights as opposed to return of tangible property.

such custodian, or proceeds, products, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and

(2) file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian.

Because, as argued by Saltz/Ruben, EME was charged by the state court only with the obligation of maintaining the *status quo* and was not granted the authority to liquidate Redman's property, EME is not a custodian as defined by 11 U.S.C. § 101(10). Saltz/Ruben Memorandum at 3–4. By this reckoning, EME, as a "caretaker", would not be subject to the command of § 543.

Saltz/Ruben's argument relies principally upon the bankruptcy court's decision in *In re Kennise Diversified Corp.,* 34 B.R. 237, 11 B.C.D. 189 (Bankr.S.D.N.Y.1983). In *Kennise Diversified,* the bankruptcy court refused to order a state court-appointed administrator to turn over to the debtor in possession a multiple-unit apartment building which was the sole asset of the bankruptcy estate. The administrator was appointed pursuant to a New York statute which established an elaborate procedure aimed at remedying conditions in multiple-unit dwellings that threatened the life, health and safety of building occupants. The administrator was directed under the state statute to collect and apply rents to ameliorate, to the extent possible, unsafe conditions existing in the subject building. The court's determination not to order turnover of the building to the debtor in possession was premised, *inter alia,* on its conclusion that the administrator was not a custodian within the meaning of § 101(10) of the Bankruptcy Code. 34 B.R. 237, 11 B.C.D. at 193–94. Fundamental to the court's conclusion was its interpretation of § 101(10) as encompassing only prepetition *liquidators* of a debtor's property. *Id.* Relying primarily on the legislative

history of § 101(10), Judge Abram reasoned as follows:

"Custodian" is a defined term and means "(A) receiver or trustee of any of the property of the debtor, appointed in a case or proceeding not under this title; "(B) assignee under a general assignment for the benefit of the debtor's creditors; or "(C) trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors." Bankruptcy Code § 101(10), 11 U.S.C. § 101(10).

The legislative history states:

"Paragraph (10) defines 'custodian'. There is no similar definition in current law. It is defined to facilitate drafting, and means a prepetition liquidator of the debtor's property, such as an assignee for the benefit of creditors, a receiver of the debtor's property, or a liquidator or administrator of the debtor's property. The definition of custodian to include a receiver or trustee is descriptive, and not meant to be limited to court officers with those titles. The definition is intended to include other officers of the court if their functions are substantially similar to those of a receiver or trustee." H.R. No. 95–595, 95th Cong. 1st Sess. 310 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6267. (Emphasis added).

This court concludes that the ... Administrator is not a custodian as that term is defined for the reason that a[n] ... Administrator's responsibilities to creditors are merely incidental to his obligation to act in the landlord's stead to correct the conditions inimical to public health and safety alleged in the petition. The ... Administrator's purpose is to cure housing violations. He collects rents so that they may be applied to this end. *The ... Administrator's actions are aimed not at a pre-petition liquidation of the debtor's property or even at protecting creditors' rights but rath-*

*er at preserving the housing stock and correcting conditions dangerous to public health, safety and welfare.*

34 B.R. 237, 11 B.C.D. at 193–94 (emphasis added).

Saltz/Ruben argue that *Kennise Diversified* is controlling in the case at bar. The Court disagrees. The dimensions of the term custodian are not so narrowly drawn as to exclude a receiver who, like EME, is not actively engaged in the liquidation of a debtor's property. Such a constricted reading of § 543 is not in keeping with fundamental tenets of statutory construction. Given the plain and unambiguous language of § 101(10), resort to its legislative history for interpretative guidance is not proper. Indeed, the principle that a court, in divining the meaning of a statute, need not look beyond the unambiguous terms of the statute itself, is a hallmark of faithful statutory construction. *Burlington Northern R. Co. v. Oklahoma Tax Comm'n.*, 481 U.S. 454–461, 107 S.Ct. 1855, 1860, 95 L.Ed. 2d 404, 412 (1987). *See also, Consumer Product Safety Comm'n. v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766, 772 (1980) (absent a "clearly expressed legislative intention to the contrary," the language of the statute itself "must ordinarily be regarded as conclusive"); *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633, 638 (1981) (unless exceptional circumstances dictate otherwise, when the terms of a statute are found to be unambiguous, judicial inquiry is complete).

Section 101(10) is sufficiently broad to include not merely pre-petition liquidators of a debtor's property but, also, those entities, like EME, who administer the assets of a debtor for the general protection of its creditors. *See, In re Gold Leaf Corp.,* 73 B.R. 146, 148–49 (Bankr.N.D.Fla.1987) (The definition [of custodian] "should be broad and not limited to a prepetition liquidator of the estate"; it "includes third parties who have taken charge of the debtor's assets for the general benefit of creditors."). Saltz/Ruben's argument is not faithful to the court's holding in *Kennise Diversified.* In that case, Judge Abram perceived a clear distinction between a custodian who

is charged with the prepetition liquidation of a debtor's property or with protecting creditors' rights as opposed to a custodian who merely preserved the *status quo* and corrected conditions dangerous to public health, safety and welfare. 34 B.R. 237, 11 B.C.D. at 193–94. In the case before the Court, EME is administering Redman's property, *viz,* operating the Wells, for the general benefit of Redman's creditors (*i.e.,* all working and overriding interest holders in the Wells). Thus, even under the reasoning in *Kennise Diversified,* EME is a custodian within the meaning of 11 U.S.C. § 101(10) and is subject to § 543's turnover requirements.

### B. *Turnover Under § 543*

Section 543(b)(1) of the Bankruptcy Code provides that a custodian "shall deliver to the trustee any property of the debtor held by or transferred to such custodian ... that is in such custodian's possession, custody or control on the date that such custodian acquires knowledge of the commencement of the case." The elements which must be proven to establish a right to turnover under § 543 are as follows:

(1) that a custodian has possession, custody or control of property; and

(2) that such property is property of the debtor.

11 U.S.C. § 543(b)(1). Having determined that EME is a custodian as defined by 11 U.S.C. § 101(10), the narrow issue for decision, then, is whether the property for which turnover is sought—the contractual right to operate the Wells—is property which should be turned over to the Debtor. The parties have not drawn the Court's attention to—and the Court has not uncovered—any case squarely addressing this issue. Nonetheless, as demonstrated below, it stands to reason that where the property subject to a turnover request is an intangible contract right a court must necessarily construe the terms of the contract to reach the ultimate issue of turnover.

The burden of proof in a turnover proceeding rests on the party seeking turnover. *Maggio v. Zeitz,* 333 U.S. 56, 68 S.Ct.

401, 92 L.Ed. 476 (1948); *In re Lah*, 91 B.R. 441, 444 (Bankr.N.D.Ohio 1988). The threshold element which must be established in any turnover proceeding, and the sole disputed legal issue here, is whether the debtor has a legal or equitable interest in the property sought to be turned over. *National Equip. & Mold Corp. v. Metro. Bank of Lima (In re National Equip. & Mold Corp.)*, 64 B.R. 239, 245 (Bankr.N.D. Ohio 1986). The burden of establishing that the Debtor has such an interest in property is allocated to the moving party. *Weiss–Wolf, Inc. v. Israel Discount Bank Ltd. (In re Weiss–Wolf, Inc.)*, 60 B.R. 969, 975 (Bankr.S.D.N.Y.1986); *National Equip. & Mold*, 64 B.R. at 245; *Wisconsin Barge Line, Inc. v. Slay Warehousing Co., Inc. (In re Wisconsin Barge Line, Inc.)*, 69 B.R. 16, 18 (Bankr.E.D.Mo.1986). State law controls the determination of whether or not the estate has an interest in the property for which turnover is sought. *Kempf v. Internal Revenue Service (In re American Way Food Service Corp.)*, 48 B.R. 79 (Bankr.W.D.Mich.1985); *In re Mortgage Funding, Inc.*, 48 B.R. 152 (Bankr.D.Nev.1985); *National Equip. & Mold*, 64 B.R. at 245.

Redman's vigorous protestations to the contrary, the Court doubtless can and must construe the Operating Agreements in reaching the merits of this turnover proceeding. To assert, as Redman does here, that turnover should be ordered without consideration of the effect of the Replacement Provision begs the pivotal question: Does Redman have an existing contractual right to operate the Wells under the Oper-

ating Agreements which is subject to turnover pursuant to § 543? Stated differently, in determining the threshold element in this turnover proceeding—whether the Debtor possesses an interest in the property sought to be turned over—the Court must, of necessity, examine the contracts under which Redman claims the right to operate the Wells. Bankruptcy courts routinely assay the meaning and effect under state law of disputed contractual provisions in passing upon turnover motions brought under 11 U.S.C. §§ 542 and 543. *See, e.g., Turner v. Burton (In re Turner)*, 29 B.R. 628, 630 (Bankr.D.Me.1983) (terms of earnest money contract revealed that debtors were not entitled to broker's share of deposit upon buyer's default; thus, deposit was not "property of the debtor" subject to turnover under § 543); *Creative Data Forms, Inc. v. Pennsylvania Minority Business Dev. Authority (In re Creative Data Forms, Inc.)*, 41 B.R. 334, 335–37 (Bankr.E.D.Pa.1984), *aff'd.*, 72 B.R. 619 (E.D.Pa.1985) (turnover not ordered where terms of loan agreement and escrow agreement indicated that debtor was not entitled to receive escrowed funds until certain contractual conditions were met; and, debtor failed to establish that such conditions were fulfilled). *Cf., Patrick v. Phoenix Strategy Corp. (Matter of Burkey)*, 68 B.R. 270, 275 (Bankr.M.D.Fla.1986) (record indicated that stock certificates had been lawfully transferred under Florida law and were no longer property of the estate which was subject to the turnover provisions of either § 542 or § 543 of the Bankruptcy Code).[2]

---

**2.** The cases cited by Saltz/Ruben decided under 11 U.S.C. § 365 also provide a useful analogue here. In each of these cases, facing a request to assume an executory contract under § 365 of the Bankruptcy Code, the courts were required to determine whether the contracts in question remained executory or, alternatively, had been terminated by their own terms prepetition. *See, e.g., Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1214 (7th Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984) (holding that the court must ascertain whether a contract has been validly terminated pre-bankruptcy in passing upon a request to assume the contract under § 365 and further stating that the filing of a Chapter 11 petition cannot resuscitate previously extinguished contract rights); *New Media Ir-*

*jax, Inc. v. DC Comics, Inc. (Matter of New Media Irjax, Inc.)*, 19 B.R. 199, 201 (Bankr.M.D. Fla.1982) (stating that while § 365 permits assumption of an executory contract; the court must, on the record before it, determine whether the contract is still viable and existing as of the petition date). *See also, Schokbeton Indus., Inc. v. Schokbeton Products Corp.*, 466 F.2d 171, 176–77 (5th Cir.1972). The above cases establish that a bankruptcy court can, and must, construe disputed contractual provisions in reaching the issue of whether there are contract rights that remain subject to assumption. If, as Redman maintains, resolution of the issue of termination should await final resolution of the entire contractual dispute, the delay which

Having carefully reviewed the Replacement Provision, and the record made at hearing, the Court concludes that Redman has not met its burden of proving that its right to operate the Wells remains extant under the Operating Agreements. The wording and legal effect of the Replacement Provision is surpassingly clear: Saltz/Ruben were granted the unfettered right to replace Redman as operator. Under Ohio law, where contractual language is clear and not susceptible to more than one interpretation, judicial construction of the contract is not called for. *Lawler v. Burt,* 7 Ohio St. 340, 350 (1857); *Allen v. Standard Oil Co.,* 2 Ohio St.3d 122, 443 N.E.2d 497, 499 (1982). Thus, Redman's contractual right to operate the Wells was terminated prior to the filing of the petition.

Redman has not supported the vague intimation made in its counsel's opening remarks that, due to Howard Atha's failure to initial Redman's version of the September 24 Operating Agreement, the Replacement Provision is ineffective. To be sure, the interlineations and marginal notations appearing on the two versions of the initial Operating Agreement (Redman Ex. 11 and Saltz Ex. C) varied in form; yet, the substance of the Replacement Provision remained constant in both versions of the initial Operating Agreement and the four Operating Agreements subsequently executed by and between Redman and Saltz/Ruben. Redman's unsupported assertion that it failed to assent to the terms of the Replacement Provision in the initial Operating Agreement is unconvincing and carries little, if any, evidentiary weight.

Redman's contention that the Replacement Provision was rendered nugatory due to its purported conflict with Redman's "exclusive right" to market gas from the Wells likewise is unavailing. Despite Redman's assertions to the contrary, evidence was not adduced to establish conclusively that Redman possessed the exclusive right to market gas from the Wells. While paragraph 8 of the Development Agreements provides that "natural gas production will be marketed from the ... Wells by Redman," this language is not sufficiently clear to express the parties' intent to grant to Redman the exclusive right to market the gas, and no other evidence was adduced to support such an interpretation.

Finally, Redman submits that the Assignment Clause—which provided that Redman's assignments of working and overriding royalty interests were subject to Redman's continued operation of the Wells—served to negate the effect of the Replacement Provision. This argument is meritless. Redman offered no evidence to establish that the Operating Agreements were subject generally to the provisions of Redman's lease with Ohio Power or to the Assignment Clause in particular. The suggestion that the Replacement Provision was somehow overridden by a collateral agreement to which neither Saltz nor Ruben were a party is jejune. *Cf., Construction Advancement Program of North Central & East Central Ohio v. A. Bentley & Sons Co.,* 45 Ohio App.2d 13, 18, 340 N.E.2d 849, 852 (1975) ("One party to a contract does not ... become bound to a second contract executed by a third party and a party to the original contract, unless the second contract is wholly or partially incorporated into the first contract."). Consequently, Redman's contention that the Replacement Provision was modified by the Assignment Clause must be discarded.

To summarize, the Court holds that EME is a custodian within the meaning of 11 U.S.C. § 101(10) and is, therefore, subject to the turnover provisions of § 543 of the Bankruptcy Code. However, because Redman failed to meet its burden of proving that it had the contractual right to operate the Wells as of the petition date, its request for turnover is not well-taken. The weight of the evidence clearly establishes that Redman's operating rights were effectively extinguished by lawful invocation of

would attend such a procedure would effectively deprive a party of the right to obtain relief under § 365. Likewise, in the present case, if resort to § 543's turnover provisions is to be obtained, the threshold issue for decision—whether the subject contract rights remain in existence—must be determined in the context of this Motion.

the Replacement Provision well in advance of the commencement of this case. Having found that turnover is not called for pursuant to 11 U.S.C. § 543, the Court need not reach the third prong of Saltz/Ruben's tripartite argument.

Based upon the foregoing, the Motion by Redman Oil Co., Inc. to Compel Custodian Eagle Mountain Energy Corporation to Turn Over Property is hereby DENIED.

IT IS SO ORDERED.