In re Tracey R. HUNTER, Debtor.

Susan L. Rhiel, Trustee, Plaintiff,

v.

OhioHealth Corporation, Defendant.

In re Brigitte Ann Strange, Debtor.

Susan L. Rhiel, Trustee, Plaintiff,

v.

OhioHealth Corporation, Defendant.

In re Alean M. Bell, Debtor.

Frederick L. Ransier, Trustee, Plaintiff,

v.

Plan Administrator, OhioHealth Retirement 403(b) Savings Plan, Defendant.

In re Kevin Douglas Longnecker and Rebecca Jean Longnecker, Debtors.

Frederick L. Ransier, Trustee, Plaintiff,

v.

AIG The Variable Annuity Life Insurance Company, Plan Administrator, Defendant.

In re Harvey J. Guikema and Debra L. Guikema, Debtors.

Susan L. Rhiel, Trustee, Plaintiff,

v.

The Variable Annuity Life Insurance Company, Defendant.

In re Roger Lee Burns and Pamela Sue Burns, Debtors.

Larry J. McClatchey, Trustee, Plaintiff,

v.

OhioHealth Corporation, Defendant.

In re James S. Brown and Joyce A. Brown, Debtors.

Frederick L. Ransier, Trustee, Plaintiff,

v.

Plan Administrator, OhioHealth 403(b) Savings Plan, Defendant.

In re Kenneth Hawkins and Jacqueline D. Hawkins, Debtors.

Susan L. Rhiel, Trustee, Plaintiff,

v.

OhioHealth Corporation, Defendant.

Bankruptcy Nos. 03–68413, 03–55454, 04–51179, 04–53276, 04–55750, 05–59738, 05–69492, 05–71605.
Adversary Nos. 05–2023, 05–2024, 05–2130, 06–2361, 05–2203, 05–2588, 06–2362, 06–2032.

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

Jan. 24, 2008.

756

Robert D. Bergman, Susan L. Rhiel, Samuel L. Calig, Frederick L. Ransier, III, Aaron Glasgow, Columbus, OH, Lawrence M. Maley, Lancaster, OH, Nicholas

W. Jones, Delaware, OH, Roger L. Weaver, Canal Winchester, OH, Norman Brusk, Reynoldsburg, OH, for Debtors.

Before: CHARLES M. CALDWELL, JOHN E. HOFFMAN, JR. and C. KATHRYN PRESTON, Bankruptcy Judges.

### MEMORANDUM OPINION ON MOTIONS FOR SUMMARY JUDGMENT

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

## I. Introduction

These adversary proceedings arise in the underlying bankruptcy cases of seven individual Debtors who participate in retirement savings arrangements made available through their employers under 26 U.S.C. § 403(b) (collectively, "Retirement Plans").[1] The Chapter 7 trustees ("Plaintiffs") of the Debtors' estates have filed complaints under 11 U.S.C. § 542 for turnover of the account balances in the Retirement Plans as of the Debtors' respective petition dates. In response, as well as in its own motions for summary judgment, Defendant OhioHealth Corporation ("OhioHealth") argues that the assets of the six Debtors ("OhioHealth Plan Debtors") who participate in the OhioHealth plan ("OhioHealth Plan") are not subject to turnover because 11 U.S.C. § 541(c)(2) excludes the Debtors' interests from their respective estates. Defendant The Variable Annuity Life Insurance Company ("VALIC") makes the same argument with respect to the retirement annuity ("VALIC Annuity") it issued to Debtor Debra L. Guikema ("Guikema").[2] In response, Plaintiffs assert that § 541(c)(2) does not exclude the Debtors' interests in the Retirement Plans.

A property interest is excluded from property of the estate under § 541(c)(2) if: (i) the interest is a beneficial interest in a trust; (ii) there is a restriction on the transfer of the interest; and (iii) the restriction is enforceable under applicable nonbankruptcy law. *Taunt v. Gen. Ret. Sys. of Detroit (In re Wilcox)*, 233 F.3d 899, 904 (6th Cir.2000). Applying this test, the Court finds that each of the Ohio-Health Plan Debtors has a beneficial interest in a trust, each interest is subject to a transfer restriction under the OhioHealth Plan, and each restriction is enforceable under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1056(d)(1). As a result, the OhioHealth Plan Debtors' interests are not property of their estates. The Court therefore grants OhioHealth's motions for summary judgment and denies Plaintiffs' summary judgment motions against OhioHealth.

The Court also denies—although for a different reason—the motion for summary judgment filed by Plaintiff Susan L. Rhiel ("Rhiel") against VALIC insofar as it seeks immediate turnover of Guikema's in-

---

1. Section 403(b) plans are similar to § 401(k) plans but are for employees of tax-exempt organizations.

2. VALIC did not file cross-motions for summary judgment. Initially there were three adversary proceedings naming VALIC as a defendant. The parties have informed the Court that *Ransier v. AIG VALIC (In re Longnecker)*, Adv. Pro. No. 06–2361, has been settled. On August 10, 2006, a notice of dismissal was entered in *Rhiel v. VALIC (In re Herrington)*, Adv. Pro. No. 05–2202, and that proceeding was closed on October 18, 2006. As a result, the adversary proceeding relating to Guikema's bankruptcy case, *Rhiel v. VALIC (In re Guikema)*, Adv. Pro. No. 05–2203, is the only remaining adversary proceeding in which VALIC is named as a defendant. Because that adversary proceeding is before Judge Hoffman, references to the "Court" in the portions of this memorandum opinion that relate only to VALIC refer to Judge Hoffman only.

terest in the VALIC Annuity. In contrast to the interests of the OhioHealth Plan Debtors, Guikema's interest in the VALIC Annuity is not excluded from her estate under § 541(c)(2) because it is not a beneficial interest in a trust. But Guikema's estate contains no more rights in the VALIC Annuity than Guikema had as of the Petition Date—a future possessory interest contingent upon events that have not yet occurred. Because Rhiel has not carried her burden of proving that Guikema is entitled to a distribution under the VALIC Plan, the Court denies the summary judgment motion against VALIC insofar as it seeks immediate turnover of Guikema's interest in the VALIC Annuity. Rhiel's summary judgment motion is granted insofar as it seeks a determination that Guikema's interest in the VALIC Annuity is property of her bankruptcy estate.

## II. Jurisdiction

The Court has jurisdiction to hear and determine these consolidated adversary proceedings pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A) and (E).

## III. Procedural Background

The OhioHealth Plan Debtors[3] and Guikema each filed bankruptcy cases prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Plaintiffs then commenced adversary proceedings seeking turnover of the account balances in the Retirement Plans, net of any taxes and penalties, as of each Debtor's respective petition date.[4]

On March 13, 2006, April 19, 2006 and June 21, 2006, the Court entered orders consolidating the adversary proceedings.[5] By those orders the Court also designated Adv. Pro. No. 05–2023 as the lead adversary proceeding.[6] In *Rhiel v. Ohio Health Corp. (In re Guikema)*, 363 B.R. 853, 854–55 (Bankr.S.D.Ohio 2007), entered March 17, 2007, this Court recounted much of the procedural history of the consolidated adversary proceedings up to that date. Subsequently, on May 29, 2007, a three-judge panel made up of Judges Caldwell, Hoffman and Preston heard oral argument ("Hearing") on Plaintiffs' motions for summary judgment, OhioHealth's motions for summary judgment, and the responses to

---

3. The OhioHealth Plan Debtors are Tracey R. Hunter, Brigitte Ann Strange, Alean M. Bell, Roger Lee Burns, Joyce A. Brown and Jacqueline D. Hawkins.

4. Because the Debtors filed their cases prior to the effective date of BAPCPA, 11 U.S.C. § 541(b)(7), which now excludes certain retirement assets from property of the estate, does not apply.

5. The Court derives its authority to issue this opinion from 28 U.S.C. § 132(c), under which the judicial power of the Court may be exercised by a single judge, "[e]xcept as otherwise provided by law, or rule or order of court...." The Court acknowledges that, because this is not an *en banc* decision, it is not binding upon the other bankruptcy judges in this district. *See, e.g., United States v. Anaya*, 509 F.Supp. 289, 293 n. 2 (1980), *aff'd sub nom., United States v. Zayas–Morales*, 685

F.2d 1272 (11th Cir.1982) ("*En banc* decisions are to be distinguished from those in which District Courts have designated a panel of several judges, but fewer than all, to establish uniformity within the district on recurring questions.").

6. Before the adversary proceedings were consolidated, the parties filed motions and cross-motions for summary judgment and responses and replies in the following adversary proceedings: Adv. Pro. No. 05–2023; Adv. Pro. No. 05–2024; Adv. Pro. No. 05–2130; Adv. Pro. No. 05–2203; Adv. Pro. No. 05–2588; Adv. Pro. No. 06–2362; and Adv. Pro. No. 06–2032. Unless otherwise specified, all references to docket entries (e.g., "Doc. ____") refer to filings in the consolidated adversary proceeding.

those motions. Participating at the Hearing were Rhiel, on her own behalf and on behalf of Trustee Larry J. McClatchey; Brenda Bowers, on behalf of Plaintiff Frederick L. Ransier; Jack R. Pigman and Ann M. Caresani, on behalf of Ohio-Health; and Peter Hahn and Charles E. Ticknor, III, on behalf of VALIC.

During the Hearing, the Court established a schedule for additional briefing on certain issues. Consistent with that schedule, the parties filed the following post-hearing briefs: (1) Post–Hearing Brief of OhioHealth Corporation (Doc. 58); (2) Post–Hearing Brief of The Variable Annuity Life Insurance Company (Doc. 59); (3) Joint Post Hearing Brief of Susan L. Rhiel, Trustee, Larry J. McClatchey, Trustee, and Frederick L. Ransier, Trustee (Doc. 60); and (4) The Variable Annuity Life Insurance Company's Notice of Supplemental Authority (Doc. 61). Post-hearing briefing was completed on September 20, 2007.

This matter is before the Court on the post-hearing briefing as well as the previously-filed summary judgment motions and the objections and other responses to those motions.

### IV. Undisputed Facts

During the Hearing, the parties agreed that there are no material facts in dispute and that the legal question before the Court involves the interpretation of Retirement Plan documents. All documents necessary to the Court's determination are before the Court. The Court sets forth the pertinent provisions of these documents below.

### A. The OhioHealth Plan

The following documents relate to the OhioHealth Plan Debtors' interests in the OhioHealth Plan: (i) the OhioHealth Retirement Savings Plan (403(b)) ("Ohio-Health Plan") and the amendments there-to; (ii) the Agreement between CitiStreet Associates LLC and Smith Barney Corporate Trust Company ("CitiStreet Agreement") with respect to a group trust of which the OhioHealth Plan is a part; (iii) the CitiStreet Retirement Services Mutual Fund Select Portfolios 403(b)(7) Custodial Account; and (iv) the Service Agreement with respect to the OhioHealth Plan.

The OhioHealth Plan contains numerous references to a trust and a trustee. Article I of the Plan contains the following definitions: " 'Trust' or 'Trust Fund' shall mean the assets of the Plan and Trust as shall exist from time to time[,]" Ohio-Health Plan § 1.53, and " 'Trustee' shall mean Smith Barney Corporation Trust Company [("Smith Barney")] or the person(s) or entity(ies) serving as Trustee pursuant to Article VIII and any successor thereto." *Id.* § 1.54.

The OhioHealth Plan provides as follows:

> All assets of this Plan shall be held in Trust by the Trustee which shall have exclusive authority and discretion to manage and control the assets of this Plan and Trust, except to the extent that the Trustee shall be subject to the direction of the Committee as expressly provided herein or to the authority of an investment manager as may be so delegated pursuant hereto.

*Id.* § 8.3.

In addition, § 8.1 of the OhioHealth Plan states that:

> All assets of this Plan shall be held in such Trust (or separate Trusts) as shall from time to time be created and maintained by the Employer as part of this Plan. Any such Trust shall be maintained by written trust agreement which shall contain such terms and conditions, consistent with the provisions of this Plan, as the Employer or, if the Employ-

er so delegates, the Committee on one part and the Trustee on the other part shall agree. . . .

*Id.* § 8.1.

Under the OhioHealth Plan, Smith Barney has the responsibility of investing, managing and controlling the Plan assets. *Id.* § 9.1. Smith Barney also has the duty, among other things, to "receive the assets of the Trust and all contributions made to the Trust . . . for the exclusive purpose of providing benefits to the Participants and their beneficiaries . . . [.]" *Id.* § 9.2(a).

Section 9.2(h) requires Smith Barney to: [P]erform all duties and to exercise all powers and authority on its part to be performed or exercised pursuant to the Trust (i) with the care, skill, prudence and diligence under then prevailing circumstances that a prudent man acting in like fiduciary capacity and familiar with such matters would exercise for the exclusive purpose of providing benefits to the participants of a like plan . . . and (ii) in accordance with all applicable provisions of the [Internal Revenue] Code and ERISA and with the provisions of this Trust so far as consistent therewith.

*Id.* § 9.2(h).

Section 9.4(a) provides that:

All assets of this Plan shall be held in the Trust created herein or in such other Trusts (or separate Trusts) as shall from time to time be created and maintained by the Company as part of this Plan. Any such Trust shall be maintained by written trust agreement which shall contain such terms and conditions, consistent with the provisions of this Plan, as the Company and the Trustee thereof shall agree.

*Id.* § 9.4(a)

Section 9.4(b) requires Smith Barney to "administer the Trust Fund as a nondiscretionary Trustee, and the Trustee shall not have any discretion or authority with regard to the investment of the Trust Fund and shall act solely as a directed Trustee of the funds contributed to it." *Id.* § 9.4(b). Smith Barney also "is authorized and empowered, by way of limitation, with the powers, rights and duties set out in Sections 9.2, each of which the Trustee shall exercise in a nondiscretionary manner as directed in accordance with the direction of the Company (or the Participants) as the named fiduciary. . . ." *Id.* "[T]he Trustee shall establish and maintain separate funds within the Trust Fund and such funds shall be referred to [as] the 'Investment Funds.'" *Id.* § 9.6(a).

The OhioHealth Plan also provides that:

Investments and reinvestments of any part or all of the Investment Fund may be made in units of any one or more collective trust funds, or in units of any other group or collective trust fund . . . provided, however, that . . . the instrument(s) establishing and/or amending any such collective trust fund shall be adopted as a part hereof as though fully set forth herein.

*Id.* § 9.6(e).

Consistent with § 9.6(e), on March 22, 2002, Smith Barney entered into an agreement with CitiStreet Associates LLC ("CitiStreet") to enable CitiStreet to operate the CitiStreet Retirement Plans Group–Trust and related § 403(b)(7) custodial accounts. This agreement acknowledges Smith Barney's status as trustee and provides that CitiStreet "stands ready to perform substantially all of the services that may be required" of Smith Barney and other trustees under the retirement plans included in the group trust. CitiStreet Agreement, pmbl.

The OhioHealth Plan also includes a restriction on the transfer of the interests of its beneficiaries. Under § 12.2(a), except

as required by qualified domestic relations orders or to repay loans made to a participant,

> [N]o benefit which shall be payable out of the Plan Fund to any person (including a Participant or his Beneficiary) shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge the same shall be void. . . .

OhioHealth Plan § 12.2(a). In addition, "no such benefit shall in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements, or torts of any such person, nor shall it be subject to attachment or legal process for or against such person. . . ." *Id.*

Finally, the OhioHealth Plan provides for matching contributions by the employer. "[T]he Employer shall contribute to the Plan ... on behalf of each Participant who is eligible to share in matching contributions for the Plan Year, a matching contribution equal to 50% of each such Participant's Deferred Compensation. . . ." *Id.* § 3.1(b).

## B. The VALIC Annuity

VALIC has filed several undisputed affidavits establishing the following facts: Guikema's employer, Grady Memorial Hospital ("Grady Memorial"), permitted its employees to make voluntary contributions through salary deferrals that were then invested on the participants' behalf through the VALIC Annuity. Guikema made regular contributions via payroll deduction. Grady Memorial submitted these contributions to VALIC. *See* Affidavit of Mary C. Birmingham, The Variable Annuity Life Insurance Company's Amended Response to the Trustee's Motion for Summary Judgment (Doc. 35, Adv.Pro. No. 05–2203) ("VALIC Amended Response"), Ex.

C. Grady Memorial did not match these contributions.

Section 6.01 of the VALIC Annuity includes the following anti-assignment provision:

> This Contract cannot be sold, assigned, discounted, or pledged as collateral for a loan or as security for the performance of an obligation. The benefits, values, and rights under this Contract are not subject to any creditor claims to the fullest extent permitted by law. Your Contract and its rights cannot be transferred to anyone other than Us, except under a domestic relations order properly issued by a court of competent jurisdiction and that complies with ERISA, if applicable. . . .

*See* VALIC Annuity § 6.01.

Contributions by Guikema were deposited into a VALIC cash account at The Bank of New York. The contributions were posted to VALIC's "Separate Account A," established by VALIC in 1979 as a segregated asset account under Texas insurance law. VALIC also registered Separate Account A with the SEC as a "unit investment trust" offering fixed and variable annuity contracts. The assets in Separate Account A are segregated and held for the exclusive benefit of the participants. The participants do not hold legal title to the monies invested in Separate Account A, nor do they hold title to any shares in the mutual funds purchased by VALIC. *See* Affidavit of Katherine L. Stoner, VALIC Amended Response, Ex. F. Guikema, not VALIC, directs the allocation of her contributions among the investment options available under the VALIC Annuity. *See* VALIC Annuity § 3.01.

Guikema's right to a distribution of the funds is subject to the following restriction:

If Your Purchase Payments are made under a voluntary salary reduction agreement with Your Employer as part of a Tax–Deferred Annuity arrangement under Section 403(b) of the [Internal Revenue] Code [then] ... there may not be a separate Plan document, in which case the Contract is the Plan, and.... Your Accumulation Value attributable to salary reduction Purchase Payments cannot be withdrawn or otherwise distributed before You are 59½ years old, unless You (1) have separated from service with the Employer, (2) die, (3) become Disabled ... or (4) have incurred a hardship (hardship withdrawal not available for earnings on salary reduction Purchase Payments). This limitation will be applied in a manner consistent with the requirements of Section 403(b)(11) of the [Internal Revenue] Code. Equivalent withdrawal restrictions apply to any portion of Your Accumulation Value that is attributable to Purchase Payments representing amounts directly transferred from a custodial account under Section 403(b)(7) of the [Internal Revenue] Code.

*Id.* § 5.01(b). There is no separate plan document for the Grady Memorial Hospital plan. The VALIC Annuity, therefore, is the plan.

In June 2001, Guikema defaulted on a loan taken against her VALIC Annuity account, leaving an unpaid loan balance of $2,618.45. VALIC is unable to recover this amount until one of the distributable events described above occurs. *See* Affidavit of Brenda Bradley, VALIC Amended Response, Ex. E.

## V. Arguments of the Parties

According to the Plaintiffs, the Debtors' net account balances in the Retirement Plans as of their respective petition dates fall within § 541(a)'s broad definition of property of the estate. Plaintiffs therefore request that Defendants turn over the account balances to Plaintiffs under § 542(a) of the Bankruptcy Code.[7]

Arguing that the Debtors' interests in the Retirement Plans constitute beneficial interests in a trust subject to a transfer restriction that is enforceable under nonbankruptcy law, Defendants assert that these interests are excluded from each of the Debtor's respective bankruptcy estates by § 541(c)(2). Alternatively, Defendants maintain that the interests must be excluded from property of the estate under § 541(c)(2) even if the Debtors' interests are not interests in a trust because the interests are in investment vehicles tantamount to a trust, which Defendants submit is sufficient to exclude the property under *Patterson v. Shumate*, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992).

In response, Plaintiffs argue that the Debtors' interests in the Retirement Plans are not excluded from property of their estates under § 541(c)(2) because *Rhiel v. Adams (In re Adams)*, 302 B.R. 535 (6th Cir. BAP 2003), requires that a debtor's interest be held in a trust, not merely in an investment vehicle tantamount to a trust. Plaintiffs claim that there is no trust with respect to either of the Retirement Plans.

VALIC also asserts that it is prohibited by both federal nonbankruptcy law and by

---

**7.** Section 542(a) states:

Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a).

the terms of the VALIC Annuity from remitting Guikema's interest in the VALIC Annuity to anyone, including a Chapter 7 trustee, until a distributable event occurs. According to VALIC, Rhiel has no greater rights in the VALIC Annuity than does Guikema, and Rhiel has not proven that Guikema has a right to distribution at this time. Rhiel has not countered this argument or presented any evidence with respect to VALIC's contentions in this regard.

## VI. Legal Analysis

### A. Summary Judgment Standard

Under Fed.R.Civ.P. 56(c), which is made applicable in these consolidated adversary proceedings by Fed. R. Bankr.P. 7056, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 577 (6th Cir.2007). In reviewing a motion for summary judgment, the Court views the evidence, all facts, and any inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Novak*, 503 F.3d at 577; *Skowronek v. Am. S.S. Co.*, 505 F.3d 482, 484 (6th Cir.2007) (the court "must draw all reasonable inferences in favor of the nonmoving party").

" '[A]s to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.' " *Niecko v. Emro Mktg. Co.*, 973 F.2d 1296, 1304 (6th Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " *Novak*, 503 F.3d at 577 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Ransier v. Standard Fed. Bank (In re Collins)*, 292 B.R. 842, 845 (Bankr. S.D.Ohio 2003). The filing of cross-motions does not alter the standards governing the determination of summary judgment motions. *See Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991); *Collins*, 292 B.R. at 845.

Here, the parties agree, and the Court accepts, that no genuine issue of material fact exists. Accordingly, summary judgment is appropriate.

### B. The § 541(c)(2) Exclusion

Section 541(c) of the Bankruptcy Code, which was not amended by BAPCPA, provides as follows:

(c)(1) Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—

(A) that restricts or conditions transfer of such interest by the debtor; or

(B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian be-

fore such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

(2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

11 U.S.C. § 541(c).

■ The Sixth Circuit has adopted a three-part test for determining whether a debtor's interest in property is excluded from property of the estate under § 541(c)(2): "First, does the debtor have a beneficial interest in a trust? Second, is there a restriction on the transfer of that interest? Third, is the restriction enforceable under nonbankruptcy law?" *Wilcox,* 233 F.3d at 904.

■ The parties initially dispute the meaning of the language "in a trust" contained in § 541(c)(2). Plaintiffs contend that this phrase means that a debtor must have a beneficial interest in a trust. On the other hand, Defendants argue that a debtor's beneficial interest in something tantamount to a trust is sufficient to trigger § 541(c)(2)'s exclusion. Given the Court's finding that the OhioHealth Plan Debtors' interests in the OhioHealth Plan are held in a trust (*see* discussion *infra* at Part VI.D), the Court need not, and therefore does not, address this argument in the six adversary proceedings in which Ohio-Health is the Defendant. But, as discussed below, the Court concludes that Guikema's interest in the VALIC Annuity is not an interest in a trust (*see* discussion *infra* at Part VI.E.2). In the adversary proceeding in which VALIC is the Defendant, therefore, the Court[8] must address

VALIC's contention that Guikema's beneficial interest in the VALIC Annuity is an interest in something tantamount to a trust and thus sufficient to trigger the § 541(c)(2) exclusion. This argument was made in *Adams* with respect to similar retirement arrangements and was considered and expressly rejected by the Bankruptcy Appellate Panel ("BAP") for the Sixth Circuit. Because the Court deems *Adams* to be binding precedent (*see* discussion *infra* at Part VI.E), it concludes that a debtor's beneficial interest in something tantamount to a trust is not sufficient to trigger the § 541(c)(2) exclusion and, accordingly, Guikema's interest in the VALIC Annuity is property of her estate.

## C. The Determination of Whether There is a Trust for Purposes of § 541(c)(2)

■ Generally, a debtor asserting that § 541(c)(2)'s exclusion applies bears the burden of proving that a property interest is an interest in a trust. *See Adams,* 302 B.R. at 540 ("The Debtors bear the burden of demonstrating that all the requirements of § 541(c)(2) have been met before the property in question can be effectively excluded from the estate."); *Hill v. Dobin,* 358 B.R. 130, 135 (D.N.J.2006) ("The debtor bears the burden of establishing that [the 541(c)(2)] requirements are met."); *Cardiello v. Seaton (In re Seaton),* 346 B.R. 389, 391 n. 1 (Bankr.W.D.Pa.2006) ("The Debtor ... has the burden of demonstrating that property is excluded via § 541(c)(2) ...." (citation omitted)). The Defendants bear the same burden here. *See Riley v. Tougas (In re Tougas),* 338 B.R. 164, 173 (Bankr.D.Mass.2006) ("When property of the estate is alleged to be held in trust, the burden rests upon the claim-

---

8. Both here and in Parts VI.E and VI.F of this memorandum opinion the "Court" refers to

Judge Hoffman alone.

ant to establish the original trust relationship . . . ." (internal quotation marks omitted)).

◼ In deciding whether a debtor's interest is an interest in a trust, courts look to the law governing the purported trust. *See, e.g., Skiba v. Laher (In re Laher)*, 496 F.3d 279, 288 (3d Cir.2007) ("In light of the inclusion of state law under 'applicable nonbankruptcy law' and the fact that trusts are creatures of state law, [the court] look[s] to New York law in this case in determining whether the annuity is a trust."); *Jacobs v. Shields*, 116 B.R. 134, 137 (D.Minn.1990) (applying Michigan law, which was the law governing the pension plan at issue, in considering whether pension plan was a trust); *In re Eley*, 331 B.R. 353, 355 (Bankr.S.D.Ohio 2005) (applying Ohio law, "the state whose laws are controlling pursuant to the terms of the [t]rust[,]" to determine § 541(c)(2)'s applicability); *Heidkamp v. Galliher (In re Hunger)*, 272 B.R. 792, 795 (Bankr. M.D.Fla.2002) ("The parties stipulated and it is well established that the legal character of a trust under consideration must be determined with reference to the state where the trust was created."); *In re Hunter*, 261 B.R. 789, 791 (Bankr.M.D.Fla. 2001) ("[T]he Trust was established and administered in the State of Missouri. Thus, whether or not the Trust is qualified as a Spendthrift Trust must be determined with reference to the applicable law of the State of Missouri."). None of the parties has asserted the existence of a constructive, resulting or other implied-in-law trust imposed by a court, and the Court sees no evidence of one. The Court therefore will look only to applicable law regarding express trusts, that is, trusts based upon the parties' intent. The Court will not address whether a trust implied in law could constitute a trust for purposes of § 541(c)(2).[9]

## D. The OhioHealth Plan Analyzed Under § 541(c)(2)

### 1. The Interests in the OhioHealth Plan are Interests in a Trust.

◼ Ohio law governs the OhioHealth Plan. *See* OhioHealth Plan § 12.3 ("This Plan shall be construed and enforced according to the [Internal Revenue] Code and the laws of the State of Ohio, other than its laws respecting choice of law, to the extent not preempted by the [Internal Revenue] Code or other federal laws."). In *Ulmer v. Fulton*, 129 Ohio St. 323, 195 N.E. 557 (1935), the Ohio Supreme Court explained the requirements for a trust:

> [T]here must be an explicit declaration of trust, or circumstances which show beyond reasonable doubt that a trust was intended to be created, accompanied with an intention to create a trust, followed by an actual conveyance or transfer of lawful, definite property or estate or interest, made by a person capable of making a transfer thereof, for a definite term, vesting the legal title presently in a person capable of holding it; to hold as trustee for the benefit of a cestui que trust or purpose to which the trust fund is to be applied . . . .

*Ulmer*, 195 N.E. at 564 (internal quotation marks omitted). *See also Adams*, 302 B.R. at 540 (relying on Ulmer for its definition of trust under Ohio law); *Booth v.*

---

**9.** At least one court has rejected the argument that § 541(c)(2) operates to exclude property held in a constructive trust. *See In re Barnes*, 264 B.R. 415, 431 (Bankr.E.D.Mich.2001) ("A value judgment underlying this provision is that '[t]he bankruptcy of the beneficiary should not be permitted to defeat the legiti-

mate expectations of the *settlor* of the trust.' Again, the highlighted term is one that would not ordinarily be used in connection with a constructive trust." (quoting H. Rep. No. 95–595, 95th Cong., 1st Sess. 176 (1977), 1978 U.S.C.C.A.N. 5963, 6136)).

*Vaughan (In re Booth),* 260 B.R. 281, 290–91 (6th Cir. BAP 2001) ("Under Ohio law, an express trust requires: (1) 'an explicit declaration of trust, or circumstances which show beyond a reasonable doubt that a trust was intended to be created'; (2) 'an intention to create a trust'; and (3) 'an actual conveyance of ... property ... to [a] trustee[.]'" (quoting *Ulmer,* 195 N.E. at 564)).

■ OhioHealth has carried its burden of proving that the OhioHealth Plan Debtors have an interest in a trust. Considering the explicit trust provisions in the OhioHealth Plan, the Court finds an express declaration of trust, an intent to create a trust and an actual conveyance of property to the trustee.

The OhioHealth Plan appoints Smith Barney as the trustee. The plan provides that "[a]ll assets of this Plan shall be held in the Trust *created herein* or in such other Trusts (or separate Trusts) as shall from time to time be created and maintained by the Company as part of this Plan." OhioHealth Plan § 9.4(a) (emphasis added). Moreover, under § 9.2(a), Smith Barney has the duty, among other things, "[t]o receive the assets of the Trust and all contributions made to the Trust ... for the exclusive purpose of providing benefits to the Participants and their beneficiaries...." *Id.* § 9.2(a). Section 9.2(h) requires Smith Barney to act "in accordance with all applicable provisions of [the Internal Revenue] Code and ERISA and *with the provisions of this Trust* so far as consistent therewith." *Id.* § 9.2(h) (emphasis added). The OhioHealth Plan Debtors have an interest in a trust under Ohio law and, therefore, have an interest in a trust for purposes of § 541(c)(2).

Plaintiffs make several arguments against the existence of a trust, none of which the Court finds persuasive. Plaintiffs assert that there is no trust for pur-

poses of § 541(c)(2) because §§ 8.1 and 9.4(a) of the OhioHealth Plan contemplate the creation of trusts separate from the OhioHealth Plan. As OhioHealth counters, the OhioHealth Plan permits, but does not require, a separate trust. In addition, the OhioHealth Plan itself is a trust—not merely because of the provision in the plan referring to the "Trust created herein"—but also because of the numerous other provisions that together meet the requirements for a trust under Ohio law. *See* discussion *supra* Part IV.A (citing OhioHealth Plan §§ 1.53; 1.54; 8.1; 8.3; 9.1; 9.2(a), (h); 9.4(a), (b); 9.6(a), (e)). No additional trust is necessary to satisfy § 541(c)(2).

Plaintiffs also argue that the OhioHealth Plan Debtors do not have an interest in a trust because Smith Barney placed each OhioHealth Plan Debtor's retirement assets into a custodial account and group trust. The use of a custodial account, however, does not nullify the trust structure utilized by OhioHealth and Smith Barney. *See* 26 C.F.R. § 1.401(f)—1(a) (2006) ("The use of a custodial account or annuity contract as part of a plan does not preclude the use of a trust or another custodial account or another annuity contract as part of the same plan."). Nor does the existence of a group trust negate the trust OhioHealth established in the OhioHealth Plan. The parties have not pointed to any provision of the agreement with CitiStreet, or of any of the other documents, that overrides the provisions of the OhioHealth Plan or the references to the trustee and trust therein. Indeed, the OhioHealth Plan provides that any documents establishing a separate group trust "shall be adopted as a part hereof as though fully set forth herein." OhioHealth Plan § 9.6(e).

Plaintiffs also claim that the OhioHealth Plan is not a true trust but is merely a

"qualified trust" under § 401(f) of the Internal Revenue Code. Under this provision of the Internal Revenue Code, an arrangement can be a "trust" for tax purposes even if it does not otherwise meet the definition of a trust under applicable law. *See Adams,* 302 B.R. at 542 (Section 401(f)(2) "provides generally that certain custodial accounts and annuity contracts are to be treated as qualified trusts, even though they are not trusts, *but only* for the purposes of Title 26, the Internal Revenue Code."). The OhioHealth Plan, however, separately meets the definition of an express trust under Ohio law.

Finally, although "ERISA itself does not require that the assets of § 403(b) plans be held in a trust[,]" *Adams,* 302 B.R. at 542,[10] Plaintiffs wrongly extrapolate from this premise that § 403(b) plans can never be held in a trust. Implicit in the *Adams* court's holding, however, is the notion that the § 403(b) retirement assets could have been held in trust had the plans met the definition of a trust under Ohio law. The present proceedings involving OhioHealth are readily distinguishable from those in *Adams,* in which there was "no mention of a trust, much less the appointment of a trustee." *Adams,* 302 B.R. at 540. Moreover, the United States District Court for the Southern District of Ohio recently held that the same plan as the OhioHealth Plan constituted a trust. *See Keller v. Ransier,* Doc. 21, No. 2:06–cv–228 (S.D.Ohio Mar. 15, 2007). The District Court did not consider the entire OhioHealth Plan itself but instead based its decision on a summary of the plan, which referred to Smith Barney as the "Trustee" of the plan and stated that contributions would be paid into a "trust fund." *Id.* at 11. This Court reaches the same result on a much more robust evidentiary record than that available to the District Court in *Keller.*

For all these reasons, the Court holds that the OhioHealth Plan Debtors' interests in the OhioHealth Plan are interests in a trust.

### 2. The OhioHealth Plan Meets the Other Requirements of § 541(c)(2).

■ Having decided that the Ohio-Health Plan Debtors have a beneficial interest in a trust, the Court will next apply the second and third prongs of the *Wilcox* test to the OhioHealth Plan: whether there is a restriction on the transfer of these Debtors' interests and, if so, whether that restriction is enforceable under applicable nonbankruptcy law. *See Wilcox,* 233 F.3d at 904. The Court finds that both of these requirements are met here.

First, the OhioHealth Plan Debtors' interests are subject to a restriction on their transfer:

> [N]o benefit which shall be payable out of the Plan Fund to any person (including a Participant or his Beneficiary) shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge the same shall be void. . . .

OhioHealth Plan § 12.2(a). Moreover, this restriction is enforceable under the applicable nonbankruptcy law of Title I of ERISA. As explained above, OhioHealth established the OhioHealth Plan as a retirement savings plan under 26 U.S.C. § 403(b), which governs retirement plans

---

**10.** *See also* 29 U.S.C. § 1103(b)(5) (the requirement that benefit plan assets be held in trust does not apply "to a contract established and maintained under section 403(b) of Title 26 to the extent that the assets of the contract are held in one or more custodial accounts pursuant to section 403(b)(7) of Title 26.").

of § 501(c)(3) tax-exempt organizations such as OhioHealth. "Three types of plans or arrangements for the benefit of employees are described in § 403(b): (i) a § 403(b)(1) annuity, (ii) a custodial account for regulated investment company stock (i.e., a mutual fund) under § 403(b)(7), and (iii) a retirement income account, defined in § 403(b)(9), sponsored by a church." Michael J. Canan, 8A West's Legal Forms, *Retirement Plans* § 6.2 (4th ed.2007). Importantly, "a § 501(c)(3) sponsor will be required to comply with Title I [of ERISA] unless employer involvement is so minimal as to fall short of the requirement that a plan be sponsored by an employer or an employee organization for Title I to be applicable." *Id.*

"ERISA, which states that '[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated,' 29 U.S.C. § 1056(d)(1), clearly imposes a 'restriction on the transfer' of a debtor's 'beneficial interest' in the trust." *Patterson,* 504 U.S. at 759, 112 S.Ct. 2242. This anti-alienation provision applies to employee benefit plans, funds or programs "'established or maintained by an employer or by an employee organization, or by both.'" *In re Herbert,* 140 B.R. 174, 176 (Bankr.N.D.Ohio 1992) (quoting 29 U.S.C. § 1002(1), (2) and (3)). In 29 C.F.R. § 2510.3–2(f), the Department of Labor has specified the kind of employer involvement that, without more, will *not* lead to a finding that a plan was established or maintained by an employer.[11] OhioHealth exceeds those criteria, in that it established and makes matching contributions for its employees to the OhioHealth Plan. The plan, therefore, is "established or maintained by an employer" within the

---

11. This provision states as follows:

Tax sheltered annuities. For the purpose of title I of [ERISA] and this chapter, a program for the purchase of an annuity contract or the establishment of a custodial account described in section 403(b) of the Internal Revenue Code of 1954 (the Code), pursuant to salary reduction agreements or agreements to forego an increase in salary, which meets the requirements of 26 CFR 1.403(b)–1(b)(3) shall not be "established or maintained by an employer" as that phrase is used in the definition of the terms "employee pension benefit plan" and "pension plan" if . . .

(3) The sole involvement of the employer, other than pursuant to paragraph (f)(2) of this section, is limited to any of the following:

(i) Permitting annuity contractors (which term shall include any agent or broker who offers annuity contracts or who makes available custodial accounts within the meaning of section 403(b)(7) of the Code) to publicize their products to employees[;]

(ii) Requesting information concerning proposed funding media, products or annuity contractors;

(iii) Summarizing or otherwise compiling the information provided with respect to the proposed funding media or products which are made available, or the annuity contractors whose services are provided, in order to facilitate review and analysis by the employees;

(iv) Collecting annuity or custodial account considerations as required by salary reduction agreements or by agreements to forego salary increases, remitting such considerations to annuity contractors and maintaining records of such considerations;

(v) Holding in the employer's name one or more group annuity contracts covering its employees;

(vi) Before February 7, 1978, to have limited the funding media or products available to employees, or the annuity contractors who could approach employees, to those which, in the judgment of the employer, afforded employees appropriate investment opportunities; or

(vii) After February 6, 1978, limiting the funding media or products available to employees, or the annuity contractors who may approach employees, to a number and selection which is designed to afford employees a reasonable choice in light of all relevant circumstances.

29 C.F.R. § 2510.3–2(f)(3) (2007).

meaning of 29 U.S.C. § 1002(1) and (2). *See* U.S. Dept. of Labor Advisory Opinion 94–30A (Aug. 19, 1994) (by making contributions to § 403(b) plan from its own assets, employer exceeded the limited involvement specified under 29 C.F.R. § 2510.3–2(f)).[12] Based on its independent review of 29 C.F.R. § 2510.3–2(f), the Court concludes that the Department of Labor's Advisory Opinion 94–30A is persuasive.[13] The OhioHealth Plan Debtors' employers make contributions to the OhioHealth Plan. Thus, the OhioHealth Plan is a plan "established or maintained by an employer" and is subject to the anti-alienation provision contained in § 206(d)(1) of Title I of ERISA. As noted above, the OhioHealth Plan contains such provisions in § 12.2(a). Under *Patterson*, ERISA makes the transfer restriction in the OhioHealth Plan enforceable under applicable law for purposes of § 541(c)(2).

As to the third prong of the *Wilcox* test, there is no serious dispute that the restriction on alienation is enforceable. Plaintiffs argue that Smith Barney's status as a "nondiscretionary Trustee" under the OhioHealth Plan means that the transfer restriction in the OhioHealth Plan is not enforceable. This is incorrect. A trustee's status as a nondiscretionary or directed trustee does not make a trust or any provision of it unenforceable. Instead, a trustee's status as a directed trustee affects only the kind of actions for which the trustee will be liable. *See In re Cardinal Health, Inc. ERISA Litigation*, 424 F.Supp.2d 1002, 1036 (S.D.Ohio 2006) ("Clearly, with respect to the selection of Plan investment options, Defendant Putnam is bound by the terms of the Trust Agreement to follow the Committee's directions ... and is, therefore, a 'directed trustee' within the meaning of ERISA § 403(a)."); *see also Afridi v. Nat'l City Bank*, 509 F.Supp.2d 655, 665 (N.D.Ohio 2007) ("[A] directed trustee is liable for investing pursuant to an instruction that it knew or should have known was not made 'in accordance with the terms of the plan' or that it was 'contrary to' ERISA." (quoting Dep't of Labor Field Assistance Bulletin 2004–03 (Dec. 17, 2004))).

In sum, the Court finds that each of the OhioHealth Plan Debtors has a beneficial interest in a trust, each interest is subject to a transfer restriction under the OhioHealth Plan, and each restriction is enforceable under ERISA. As a result, the OhioHealth Plan Debtors' interests are not property of their respective estates.[14]

---

**12.** http://www.dol.gov/ebsa/programs/ori/
advisory94/94–30a.htm.

**13.** "Although the [Department of Labor's] advisory opinion is not binding on us, it is worthy of some deference. Interpretive guidance from administrative agencies that is not the product of formal, notice-and-comment rulemaking is entitled to respect to the extent that th[e] interpretations have the power to persuade." *Bank of New York v. Janowick*, 470 F.3d 264, 269 (6th Cir.) (citations omitted) (internal quotation marks omitted) (citing *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)), *cert. denied,* —— U.S. ——, 128 S.Ct. 195, 169 L.Ed.2d 36 (2007).

**14.** In light of the Court's holding that the OhioHealth Plan Debtors' interests are not property of their respective estates, the Court need not address OhioHealth's alternative argument that the interests constitute exempt property. *See Casey v. Grasso (In re Riccitelli)*, 320 B.R. 483, 487 n. 8 (Bankr.D.Mass. 2005) ("[Defendant] argues that ... the malpractice claim ... should ... be deemed exempt (as opposed to excluded from the estate). Because the Court concludes that the malpractice claim is not an asset of the estate, this argument is moot ... and therefore the Court need not and does not address it."); *In re Hipple*, 225 B.R. 808, 817 n. 9 (Bankr. N.D.Ga.1996) ("The court need not consider whether the SEP/IRA and TIAA/CREF accounts are exempt under Georgia exemption

### E. The VALIC Annuity Analyzed Under § 541(c)(2)[15]

VALIC asserts two arguments in support of its position that the VALIC Annuity is not property of Guikema's bankruptcy estate—and thus not subject to turnover. First, VALIC claims that it need not demonstrate that the VALIC Annuity is an interest in a trust in order to trigger § 541(c)(2)'s exclusion. Relying on *Patterson* and *Teachers Insurance & Annuity Ass'n v. Bareham (In re Quinn)*, 327 B.R. 818, 824 (W.D.Mich.2005), VALIC submits that any interest in a tax-deferred retirement plan or trust containing an enforceable transfer restriction—not only an interest held in trust—is excluded from a debtor's estate by § 541(c)(2). Second, arguing in the alternative, VALIC maintains that Guikema's interest in the VALIC Annuity does in fact constitute an interest in a trust for purposes of § 541(c)(2). Neither of these arguments is persuasive.

### 1. Binding BAP Precedent Holds That a Trust is Required to Trigger the § 541(c)(2) Exclusion.

VALIC's first argument—that an interest in a tax-deferred retirement plan containing an enforceable transfer restriction is tantamount to a trust and thus can trigger the § 541(c)(2) exclusion—runs directly counter to the BAP's holding in *Adams*. Rejecting the identical argument advanced by VALIC here, the BAP in *Adams* accepted the trustee's contention that § 541(c)(2) "exclude[s] from property of the estate only a debtor's beneficial interest in a trust, not necessarily his in-

terest in a pension plan, or ERISA-qualified pension plan, or anything other than a trust." *Adams*, 302 B.R. at 539. The BAP adopted the analysis set forth in *In re Barnes*, 264 B.R. 415, 421–29 (Bankr. E.D.Mich.2001), reasoning:

> In a lengthy discussion of this subject ... [the *Barnes* court] recognized that some courts appear to have adopted the proposition that
>
>> an employee benefit plan need not be a trust at all: So long as the plan has an enforceable transfer restriction and is designed to function in a manner "analogous" to a spendthrift trust, the debtor's interest therein will be excluded from the bankruptcy estate pursuant to § 541(c)(2).
>
> [264 B.R. at 428.] The court then disagreed with that view and insisted that proof of a trust was essential to exclusion under § 541(c)(2).
>
>> This Court rejects that proposition. There is no statutory support for the notion that in determining whether a trust was created, employee benefit plans are subject to a less stringent standard than are other assets in which the debtor holds an interest. Since § 541(c)(2) makes no distinction along these lines, neither should the courts.
>
> [264 B.R.] at 428 (citation omitted). We agree with and adopt the views in *Barnes* regarding the trust requirement of § 541(c)(2) and, following *Wilcox*, hold that only an interest in a trust can be the subject of an enforceable transfer restriction within the meaning of 11 U.S.C. § 541(c)(2).

---

law because the accounts are excluded from property of the estate.").

15. As noted above, the only adversary proceeding in which VALIC is a Defendant is before Judge Hoffman. Judge Caldwell and

Judge Preston, therefore, do not join in this Part VI.E or in Part VI.F of the memorandum opinion, and in these sections the "Court" refers to Judge Hoffman alone.

**771**

*Adams,* 302 B.R. at 539 (quoting *Barnes,* 264 B.R. at 428 (footnote omitted)).

The BAP's decision in *Adams* is in accord with an earlier unreported opinion from the Sixth Circuit in *Sicherman v. Ohio Pub. Employees Deferred Comp. Program (In re Leadbetter),* 992 F.2d 1216 (table), 1993 WL 141068 at *3 (6th Cir. Apr.30, 1993). There, the court confronted the question of whether § 541(c)(2) excluded from the bankruptcy estate the debtor's interest in a state-administered "public deferred compensation plan meeting the requirements of 26 U.S.C. § 457...." *Leadbetter,* 1993 WL 141068 at *2. The Sixth Circuit had previously determined that the interest was not excluded, but "[t]he Supreme Court ... vacated [that] ... opinion for reconsideration in light of its decision in *Patterson* ...." *Id.* at *1. Upon remand, the Sixth Circuit ruled that § 541(c)(2) did not apply, stating:

> By its own terms, a predicate to the application of § 541(c)(2) is that the property interest sought to be excluded be "a beneficial interest ... in a trust." 11 U.S.C. § 541(c)(2).... Here, [26 U.S.C.] § 457(a)(6) ... provides that the deferred compensation remains the property of the employer, subject only to general creditor claims. By definition, a trust exists only when one party, the trustee, holds legal title to the corpus, while another party, the beneficiary, holds equitable or beneficial title in the corpus. Thus, under § 457, the

Ohio Program cannot be a trust because there is no division of title; rather, all the funds are the sole property of the Ohio program.

> ....

> Because the unambiguous language of § 541(c)(2) requires that the Ohio Program be a trust, and the Ohio Program cannot be one, the § 541(c)(2) exception is inapplicable. Thus, [the] debtor's deferred compensation in the Ohio Program remains part of the bankruptcy estate under § 541(a)(1).

*Id.* at *3–4 (emphasis added) (citations omitted).[16]

In sum, both *Adams* and the Sixth Circuit's unreported *Leadbetter* decision squarely reject the argument asserted by VALIC here—that an interest in a tax-deferred retirement plan containing a valid transfer restriction is tantamount to a trust and thus triggers § 541(c)(2)'s exclusion. As explained below, the Court deems *Adams* to be binding precedent. Thus, despite VALIC's invitation to do so, the Court is not free to disregard the BAP's holding in *Adams.* The Court accordingly need not address the merits of VALIC's "tantamount-to-a-trust" argument.

■■■■ Although VALIC does not directly challenge the precedential force of BAP decisions, it does so indirectly by advancing an argument considered and rejected by the *Adams* court.[17] The issue of

---

**16.** "Although unpublished decisions of the Sixth Circuit are not binding precedent, they can be cited ... [as] persuasive [authority]...." *Belfance v. Black River Petroleum, Inc. (In re Hess),* 209 B.R. 79, 82 n. 3 (6th Cir. BAP 1997) (citing *In re Braddy,* 195 B.R. 365, 370–71 (Bankr.E.D.Mich.1996)). *See Gibson v. Gibson (In re Gibson),* 219 B.R. 195, 201 n. 2 (6th Cir. BAP 1998) ("Although not binding [precedent], unpublished decisions of the Sixth Circuit may be cited if persuasive and no published decision will serve as well.").

**17.** VALIC argues that the VALIC Annuity should be excluded from Guikema's estate even if it is found to be a "non-trust annuity plan." VALIC Mem. in Opp'n to the Trustee's Mot. for Summ. J. (Doc. 34, Adv.Pro. No. 05–2203) at 17. Thus, while it does not directly assert that BAP decisions are not binding on bankruptcy courts, VALIC challenges the precedential weight of *Adams* by urging the Court to accept a proposition rejected by the BAP in *Adams.* Indeed, a heading contained in a brief filed by VALIC reads: "Even If The

whether BAP decisions are binding on bankruptcy courts has spawned conflicting caselaw and divided legal commentators. One line of authority holds that BAP decisions bind bankruptcy courts throughout the circuit. *See In re Windmill Farms, Inc.,* 70 B.R. 618, 622 (9th Cir. BAP 1987) ("One of the reasons for establishing the BAP was to provide a uniform and consistent body of bankruptcy law throughout the entire Circuit. In order to achieve this desired uniformity, the decisions of the Bankruptcy Appellate Panel must be binding on all of the bankruptcy courts from which review may be sought, i.e., each district in the Ninth Circuit. Any decisions to the contrary ... are in error." (citations omitted)), *rev'd on other grounds sub nom. Vanderpark Props., Inc. v. Buchbinder (In re Windmill Farms, Inc.),* 841 F.2d 1467 (9th Cir.1988); *In re Griffin,* 339 B.R. 900, 902 (Bankr.E.D.Ky.2006) ("This court *is* bound by decisions of the Sixth Circuit Bankruptcy Appellate Panel...."); *Coyne v. Westinghouse Credit Corp. (In re Globe Illumination Co.),* 149 B.R. 614, 621 (Bankr.C.D.Cal.1993) ("The bankruptcy courts throughout the circuit certainly must be bound by a BAP decision. They are 'lower' courts, within the meaning of the stare decisis rule. The BAP is the designated circuit level panel for bankruptcy appeals that go to the circuit court (as opposed to the district court) for resolution of the first level appeal. Thus the bankruptcy courts of the circuit

owe obedience to the BAP, and are bound by its decisions."). *See also* David A. Levin, *Precedent and the Assertion of Bankruptcy Court Autonomy: Efficient or Arrogant?,* 12 Bankr.Dev. J. 185, 216–17 (1995) ("In the circuits which adopt the use of BAPs, a uniform expression of the BAPs' precedential value is necessary. Congress has stated that BAPs are to be created to help establish a uniform body of bankruptcy law, and therefore bankruptcy courts must adhere to the decisions of BAPs or else frustrate the legislative intent of their creation." (footnote omitted)); Daniel J. Bussel, *Power, Authority, and Precedent In Interpreting the Bankruptcy Code,* 41 UCLA L.Rev. 1063, 1098 (1994) ("Stare decisis is a logical imperative of the BAP ... law-declaring role. The law-declaring function reaches out beyond the immediate parties to the community at large. Unless, in deciding future cases, the bankruptcy courts are obliged to follow the rules announced by the appellate courts, those courts are engaged in a meaningless, abstract function."). A second line of cases holds that BAP decisions have limited or no precedential effect. *See In re Millspaugh,* 302 B.R. 90, 96 n. 8 (Bankr.D.Idaho 2003) ("BAP decisions are generally viewed as lacking binding effect."); *In re TLI, Inc.,* 292 B.R. 589, 591 n. 1 (Bankr.W.D.Mich.2003) ("Although [the applicant] urges the Court to rely upon [Sixth Circuit BAP decisional authority,] ... [t]hese decisions of the bankrupt-

---

Debtor's Plan Is Not A Trust, It Still Should Be Excluded From The Bankruptcy Estate Because It Resembles A Trust And Because Congress Intended To Exclude Tax–Deferred Pension Plans Under Section 541(c)(2)." *Id.* at 16. Further, VALIC relies on two decisions—*Teachers Insurance & Annuity Ass'n v. Bareham (In re Quinn),* 327 B.R. 818, 824 (W.D.Mich.2005) and *Skiba v. Gould (In re Gould),* 322 B.R. 741, 744 (Bankr.W.D.Pa. 2005)—that reject the holding of *Adams* and find that any interest in an ERISA-qualified

plan is excluded from the bankruptcy estate if the plan is subject to an enforceable transfer restriction under applicable nonbankruptcy law. The Court notes that the bankruptcy court's decision in *Gould,* which VALIC relies upon, was reversed by the district court in *Skiba v. Gould,* 337 B.R. 71 (W.D.Pa.2005). There, the district court held—like the BAP in *Adams*—"that only a debtor's beneficial interest in a *trust* may be excluded from the bankruptcy estate pursuant to [§ 541(c)(2)]." *Id.* at 74.

cy appellate panels are no more controlling upon this Court than those of a district court in another district."); *In re Virden,* 279 B.R. 401, 409 n. 12 (Bankr.D.Mass. 2002) ("[T]he Court notes that although the BAP decision may be persuasive authority, it is not binding precedent on this Court."); *In re Williams,* 257 B.R. 297, 301 n. 5 (Bankr.W.D.Mo.2001) ("While the rulings of the Bankruptcy Appellate Panels are entitled to appropriate respect, those rulings are not binding on the Bankruptcy Court."); *Daly v. Deptula (In re Carrozzella & Richardson),* 255 B.R. 267, 273 (Bankr.D.Conn.2000) ("[T]his Court will regard BAP opinions as highly persuasive though not binding, precedent."); *State of Oregon, Higher Educ. Assistance Found. v. Selden (In re Selden),* 121 B.R. 59, 62 (D.Or.1990) ("Because a bankruptcy court is not bound by decisions from other districts, it should not be bound by BAP decisions originating in another district."). *See also* Rigoberto V. Obregon, *In re Globe Illumination Co.: A Provocative But Flawed Theory on the Precedential Value of BAP Authority,* 21 Cal. Bankr.J. 45, 52 (1993) ("[U]nder the present statutory scheme, BAP decisions are not binding on any court."); Kathleen P. March & Rigoberto V. Obregon, *Are BAP Decisions Binding on Any Court?,* 18 Cal. Bankr.J. 189, 202 (1990) ("[A]bsent legislation revising the entire bankruptcy jurisdictional scheme, it may not be practical to use the BAP to promulgate a uniform and consistent body of bankruptcy law binding on all bankruptcy judges...."). *Cf. Zimmer v. PSB Lending Corp. (In re Zimmer),* 313 F.3d 1220, 1225–26 n. 3 (9th Cir.2002) ("Although the binding nature of Bankruptcy Appellate Panel decisions—an open question in this circuit—is not squarely before us in this case, we ... call for the Judicial Council to consider an order clarifying whether the bankruptcy courts must follow the BAP.").

A leading treatise distills the conflicting caselaw on the issue of the precedential effect of BAP decisions to what it describes as four different approaches taken by the lower courts:

Under the first approach, discussed in the *Globe [Ilumination]* case, Bankruptcy Appellate Panels are a unit of the circuit court, and therefore a decision of a Bankruptcy Appellate Panel has the same binding effect as any other circuit court authority....

Under the *Globe* approach, all bankruptcy courts throughout a circuit are considered inferior to all Bankruptcy Appellate Panels of that circuit. Accordingly, under the doctrine of stare decisis, a decision of any Bankruptcy Appellate Panel would bind bankruptcy judges circuit-wide....

. . . .

The second approach considers Bankruptcy Appellate Panels and district courts both as intermediate appellate bodies between the bankruptcy court and the court of appeals. The precedential effect of a ruling by either the Bankruptcy Appellate Panel or the district court is determined by looking to the judicial district in which the appeal is taken. Where, as in the Ninth Circuit, all of the districts have authorized review by a Bankruptcy Appellate Panel, a Bankruptcy Appellate Panel decision would bind bankruptcy courts throughout the circuit....

The third approach views ... Bankruptcy Appellate Panel rulings as binding precedent only in the district where the decision appealed from arose. Those decisions reason that Bankruptcy Appellate Panels occupy the same level as district courts in the appellate scheme, and serve as a surrogate for that court. Therefore, decisions of the

Bankruptcy Appellate Panel are entitled to the same stare decisis effect as a decision of the particular district court in whose stead the panel is acting. These decisions assume that district court decisions are binding upon bankruptcy courts from within the district.

The fourth approach, which is the most restrictive view of the stare decisis effect of Bankruptcy Appellate Panel and district court decisions, concludes that they have no binding effect upon any court. Under this view, bankruptcy trial courts and Bankruptcy Appellate Panels are considered part of the district court. As such, they occupy the same level as a district court for the purposes of stare decisis. Under this view, referral of a bankruptcy appeal by a district court does not constitute referral to another court, but merely to a different unit of the same district court.

Because decisions of one district court judge do not bind other district judges and bankruptcy judges act as part of the district court, a decision of one district judges does not bind the bankruptcy court. By analogy, a decision of the Bankruptcy Appellate Panel, which also acts in the stead of the district court, is not binding on bankruptcy courts.

6 William L. Norton, Jr., *Norton Bankruptcy Law & Practice 2d* § 148:17 (2d ed.2007) (footnotes omitted).

While recognizing that there are principled arguments supporting the view that BAP decisions do not bind bankruptcy courts, the Court respectfully disagrees for the reasons expressed by the bankruptcy court in *In re Tong Seng Vue,* 364 B.R. 767, 771–72 (Bankr.D.Or.2007):

In the present case, the BAP's opinion ... should control for the following reasons: The [d]octrine of *stare decisis* advances two important principles: the uniformity of case law throughout a jurisdiction, and the resulting predictability of results required in order to ensure fairness of the judicial process to litigants. As a matter of fundamental fairness to parties before it, a trial court must strive to apply the law as it is held by courts which may review its decisions. Otherwise, parties will often be forced to the trouble and expense of an appeal to achieve a lawful result whenever the trial court disagrees with the higher court's view of the law. Rules of comity and *stare decisis* are essentially corollaries of this basic rule.

... It is one thing to say that District Court authority somehow outweighs the BAP's where the two conflict; it is quite another to say that, where the District Court has been silent, the Bankruptcy Courts are free to disregard the opinions of the BAP. Such a rule would seriously undermine the BAP's role in promoting uniformity in the law in this Circuit.

A similar view was expressed in *Muskin, Inc. v. Industrial Steel Co. (In re Muskin, Inc.),* 151 B.R. 252 (Bankr.N.D.Cal.1993). There, the bankruptcy court voiced its disagreement with a Ninth Circuit BAP decision holding that there are no equitable grounds for dismissal of a preference action, but concluded that it was not free to simply disregard the BAP's holding. The *Muskin* court stated:

When a judge refuses to follow an Appellate Panel decision, he or she is acting detrimentally to the bankruptcy system for two reasons. First, he or she is wasting a valuable resource. Appellate Panel judges are ordinary bankruptcy judges who, in addition to their regular duties, have volunteered to grapple with complex issues and reach reasoned decisions which not only resolve the dispute of the litigants but provide guidance for all litigants in the

circuit. Ego aside, there is no good reason why a bankruptcy judge should want to spend hours struggling with a complicated and thorny issue when three other bankruptcy judges have already done the same thing, reached a conclusion, and published a decision for the benefit of all.

Second, and more importantly, a bankruptcy judge who feels free to disregard Appellate Panel decisions deprives every attorney in his or her territory of the ability to predict the outcome of a bankruptcy dispute, at least at the trial court level. It is the attorneys, and not the judges, which make any legal system work by counseling their clients and crafting compromises so that only a small portion of potential disputes ever actually come before the judge for adjudication. Published court decisions, whether favorable or unfavorable to a particular position, are the tools a competent lawyer uses in advising his or her clients. The bankruptcy judge who refuses to feel bound by Appellate Panel decisions takes this tool away from the attorneys and thereby harms the system.

*Id.* at 254–55.

Like the *Tong Seng Vue* and *Muskin* courts, the Court concludes that failure to follow a BAP decision that is directly on point—here, *Adams*—would seriously undermine the BAP's role in promoting the law in this circuit and waste valuable judicial resources. *See Tong Seng Vue,* 364 B.R. at 772; *Muskin,* 151 B.R. at 254–55. *See also Levin,* 12 Bankr.Dev. J. at 208 ("As seen in the legislative history of the 1994 Act, the clear intent of mandating the use of BAPs was to help 'establish a dependable body of bankruptcy case law.'" (quoting 140 Cong. Rec. S14, 463 (daily ed. Oct. 6, 1994) (statement of Sen. Heflin))). The Court accordingly concludes that *Adams* is binding authority. Thus, it need not analyze the merits of VALIC's contention that *any* interest in a tax-deferred retirement plan with an enforceable transfer restriction—including plan assets not contained in a trust—may be excluded from a debtor's bankruptcy estate under § 541(c)(2). Adherence to *Adams* compels the Court to reject this argument.[18]

**18.** As noted, having found that *Adams* is binding authority, the Court need not address VALIC's assertion that any interest in a tax-deferred retirement plan containing an enforceable transfer restriction is excluded from a debtor's bankruptcy estate by § 541(c)(2). But even if it were free to examine the issue afresh, the Court would not be persuaded by VALIC's contention that *Patterson* stands for the proposition that § 541(c)(2) excludes non-trust, plan assets from a debtor's estate. In *Patterson,* the Supreme Court stated that § 541(c)(2) "entitles a debtor to exclude from property of the estate any interest in *a plan or trust* that contains a transfer restriction enforceable under any relevant nonbankruptcy law." *Patterson,* 504 U.S. at 758, 112 S.Ct. 2242 (emphasis added). But the only issue before the Court in *Patterson* was whether the phrase "applicable nonbankruptcy law" meant both state law and federal law such as ERISA, or whether it was limited, as some courts had held, to state spendthrift trust law.

The Court interpreted the phrase "applicable nonbankruptcy law" in light of its plain meaning and held that the transfer restriction in the pension plan at issue, which was enforceable under ERISA, constituted a transfer restriction enforceable under applicable nonbankruptcy law. *Id.* at 759–60, 112 S.Ct. 2242. The Court did not address the specific issue of whether § 541(c)(2) requires that a transfer restriction be contained in a trust. Thus, the Supreme Court's statement in *Patterson* that § 541(c)(2) entitles a debtor to exclude from property of the estate any interest "in a plan or trust" appears to be mere dicta. *See Adams,* 302 B.R. at 547 ("the reference to 'the plan' [in *Patterson]* may be merely dicta") (Latta, J., dissenting); *Quinn,* 327 B.R. at 829 n. 9 ("[T]he reference to a 'plan' was *dicta* because the Court was not confronted with the trust issue...").

Contrary to VALIC's suggestion, *Patterson* does not *hold* that, notwithstanding the stat-

■ Finally, the Court notes that VALIC's reliance on *Quinn* is misplaced. In *Quinn*, the United States District Court for the Western District of Michigan held that a trust was not required in order to trigger § 541(c)(2)'s exclusion. *Quinn*, 327 B.R. at 826. *Quinn* reaches a conclusion directly contrary to the BAP's holding in *Adams*. It is well-settled that bankruptcy courts are not bound by district courts from outside the district. *See Selden*, 121 B.R. at 62. Whatever persuasive force *Quinn* may have, it must yield to *Adams's* binding precedent.

### 2. Guikema's Interest in the VALIC Annuity is Not in a Trust.

■ The VALIC Annuity does not contain a governing law provision. VALIC asserts that Texas law may apply because it established the VALIC Annuity under Texas insurance law and that Ohio law may apply because Guikema is a resident here. "[B]ecause the ultimate result is the same applying either law, the Court need not decide this issue." *Derda, Inc. v. Foley–Belsaw Co.*, 16 F.3d 1219 (table), 1994 WL 20228 at *3 n. 1 (6th Cir. Jan.26, 1994) (internal quotation marks omitted).

Under § 1152.051 of the Texas Insurance Code, "[a] domestic life insurance company may establish separate accounts ... to ... fund a benefit for a pension, retirement, or profit sharing plan payable in a fixed amount, a variable amount, or both a fixed amount and a variable amount." Tex. Ins.Code Ann. § 1152.051(2) (Vernon 2003). But under the Texas Insurance Code an insurance company—like VALIC—"is not and may not represent itself as a trustee regarding an amount allocated to a separate account under this subchapter." Tex. Ins.Code Ann. § 1152.052(b).

VALIC formed Separate Account A under the Texas insurance law in effect in 1979. That law was amended in 1983; § 1152.001(c) of the new law, however, provides that a separate account established under the former law "is considered to be established under this chapter." Tex. Ins.Code Ann. § 1152.001(c). Accordingly, § 1152.052 applies, and as a result VALIC cannot be a trustee with respect to Separate Account A under Texas law.

Likewise, VALIC cannot be a trustee under Ohio law:

A domestic life insurance company may ... issue ... annuities ... providing benefits or other contractual payments payable in fixed or variable dollar amounts, or both, and allocate to one or

ute's express terms, the § 541(c)(2) exclusion applies even to debtors who do not have a beneficial interest in a trust. Indeed, accepting the expansive reading of *Patterson* urged by VALIC would require a departure from the plain-meaning approach embraced by the Supreme Court in that case. *See Patterson*, 504 U.S. at 757, 761 n. 4, 112 S.Ct. 2242 ("In our view, the plain language of the Bankruptcy Code and ERISA is our determinant.... Those Courts of Appeals that have limited 'applicable nonbankruptcy law' to state spendthrift trust law by ignoring the plain language of § 541(c)(2) and relying on isolated excerpts from the legislative history thus have misconceived the appropriate analytical task."). *See also U.S. Nat'l Bank of Oregon v.*

*Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 463 n. 11, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) ("[W]e conclude that the meaning of the 1916 Act is plain ... [O]ur remark in [a prior decision] ... is obviously not controlling, coming as it did in an opinion that did not present the question we decide in these cases.... Neither case tells us anything helpful for resolving this one, though together they contain a valuable reminder about the need to distinguish an opinion's holding from its dicta."); *Walker v. Bain*, 257 F.3d 660, 667 (6th Cir.2001) (" 'When we can discern an unambiguous and plain meaning from the language of a statute, our task is at an end.' ") (quoting *Bartlik v. U.S. Dep't of Labor*, 62 F.3d 163, 166 (6th Cir.1995) (*en banc*)).

more separate accounts any amounts which are to be applied to provide such benefits.... *The company shall not be, or hold itself out to be, a trustee in respect of such amounts.*

Ohio Rev.Code Ann. § 3907.15(A) (West 2007) (emphasis added); *see also* Ohio Rev.Code Ann. § 3911.01 ("The business of life insurance ... in this state, shall not be in any way transacted by any company ... which in this state, or in any other state or country ... does a banking or any other kind of business in connection with insurance.").

The *Adams* court relied on New York and Connecticut statutes similar to the Ohio statute in determining that a trust did not exist in that case. *See Adams,* 302 B.R. at 545 ("[T]he state statutes that regulate insurers who participate in such plans specifically prohibit the insurers from being trustees."). Although a trust does not necessarily fail for want of a trustee if one can be appointed, the Court does not believe there is a trust at all where, as here, there are no references in the governing documents to a trustee and the entity that holds the supposed trust assets is prohibited under applicable law from being a trustee. *See Leadbetter,* 1993 WL 141068 at *3 ("By definition, a trust exists only when one party, the trustee, holds legal title to the corpus, while another party, the beneficiary, holds equitable or beneficial title in the corpus."); *Hill,* 358 B.R. at 138 (holding that annuity contract was not a trust where there was "no indication in the annuity documents that [the issuer of the annuity] has assumed the role of trustee"); *Seaton,* 346 B.R. at 391 (holding that retirement funds were not held in trust where review of plan documents showed that there was no trustee for the purported trust); *Daniels v. Pecan Valley Ranch, Inc.,* 831 S.W.2d 372, 378 (Tex.App.1992) (holding annuity contract was not a trust because, among

other things, "the document in issue is called an annuity, not a trust[, and] [i]t does not name a trustee"). Given the absence of a trustee, the Court holds that Guikema's interest in the VALIC Annuity is not an interest in a trust.

VALIC also argues that the variable nature of the VALIC Annuity makes the annuity a trust. To support its position, VALIC relies on *Barnes.* In *Barnes,* the court held that the debtor's interest in a variable annuity issued by the College Retirement Equities Fund ("CREF") was an interest in a trust because CREF's investment decisions determined the amount of annuity payments the debtor would receive. *See Barnes,* 264 B.R. at 434. *Barnes,* however, is inapposite. In *Barnes,* there was no suggestion that CREF was prohibited by applicable law from serving as a trustee. Moreover, the *Barnes* court found CREF to be a trustee in part because CREF allocated the debtor's investments. By contrast, the investments that the *Adams* court determined were not held in trust were held in variable annuities for which "the allocation [was] made solely at the direction of Mr. Adams." *Adams,* 302 B.R. at 541 ("The value of the benefit Mr. Adams eventually receives depends on the amounts he contributes to Equitable and the success of his investment decisions prior to his retirement."). Guikema, not VALIC, directs the allocation of her contributions among the investment options available under the VALIC Annuity. Hence, the variable nature of the investments made on behalf of Guikema in Separate Account A does not alter the non-trust status of Separate Account A.

The Court also rejects VALIC's argument that there must be a trust whenever there is a division of legal title. "Unlike the *Barnes* court ... this Court does not

adopt the view that division of title conclusively establishes that the asset is a trust." *Hill*, 358 B.R. at 138. Indeed, another provision of the Bankruptcy Code not directly at issue here, 11 U.S.C. § 541(d), identifies property interests that, although not trusts, exhibit a division of legal and equitable title. *See, e.g., City of Springfield v. Ostrander (In re LAN Tamers, Inc.)*, 329 F.3d 204, 214 (1st Cir.2003) ("[T]he language of § 541(d) ... is not always limited to trusts.... In some of the cases discussed above, courts classified the excluded property as the corpus of a trust of some kind.... This usage may prove confusing, however, because these supposed trusts might lack characteristics of trusts recognized for other purposes under state law." (citations omitted)); *Pemaquid Underwriting Brokerage, Inc. v. D & H Alternative Risk Solutions, Inc. (In re Pemaquid Underwriting Brokerage, Inc.)*, 319 B.R. 824, 837 (Bankr.D.N.J.2005) (following *LAN Tamers*).

Equally unpersuasive is VALIC's argument that the VALIC Annuity must be a trust because Separate Account A is a "unit investment trust" and is registered as such with the SEC under the Investment Company Act of 1940. Under that Act, an investment vehicle can be a unit investment trust without actually being a trust under applicable law. This is because the Investment Company Act of 1940 defines "unit investment trust" as follows:

> "Unit investment trust" means an investment company which (A) is organized under a trust indenture, contract of custodianship or agency, or similar instrument, (B) does not have a board of directors, and (C) issues only redeemable securities, each of which represents an undivided interest in a unit of specified securities; but does not include a voting trust.

15 U.S.C. § 80a–4(2). Separate Account A is not organized under a trust indenture or other trust structure. The account therefore is not a trust for purposes of § 541(c)(2) despite its status as a unit investment trust.

Nor does it help VALIC that Separate Account A is a "qualified trust" under § 401(f) of the Internal Revenue Code. As explained above, under that section an entity may be treated as a trust—but only for Internal Revenue tax purposes—if it meets certain requirements despite not otherwise meeting the definition of a trust under applicable law. *See Adams*, 302 B.R. at 542 ("Again, that special treatment is expressly limited to the Internal Revenue Code and so does not apply at all to the Bankruptcy Code."); *Seaton*, 346 B.R. at 391 (holding that a plan that was not a trust under applicable law but was a qualified trust under § 401(f) was not a trust for purposes of § 541(c)(2) because § 401(f) expressly operates only for federal income tax purposes).

Finally, VALIC's status as a fiduciary does not make VALIC a trustee (which it cannot be under Texas law) or its Separate Account A a trust. The *Adams* court reached the same conclusion when analyzing why ERISA exempts § 403(b) plans from the trust requirement:

> [W]hen ERISA was first proposed as a comprehensive piece of legislation to govern pension plans in the United States, the insurance companies, having done a good business selling retirement annuities to charitable organizations, wished to keep that business. *Since insurance companies are in the business of selling contracts, not acting as trustees*, it was necessary for them to obtain an exception from ERISA's general rule that plan assets were to be held in trusts.

*Adams,* 302 B.R. at 543 (emphasis added). The *Adams* court continued its analysis by holding that "an employer, although he holds the annuity contracts for safekeeping and is a fiduciary under ERISA, need not be a trustee [and] [f]urthermore, the insurance company involved in the plan need not be a trustee under ERISA." *Id.; see also Seaton,* 346 B.R. at 391 (stating with respect to retirement plan that "even though a plan trustee is a fiduciary of such plan, a plan fiduciary need not necessarily be a trustee of such plan").

For all these reasons, the Court concludes that Guikema's interest in the VALIC Annuity is not an interest in a trust for purposes of § 541(c)(2). The Court, therefore, need not address whether the restriction on transfer of Guikema's interest in the VALIC Annuity is enforceable under applicable nonbankruptcy law.

## F. Guikema's Net Account Balance is Not Subject to Turnover at This Time.

 The Court's finding that Guikema's interest in the VALIC Annuity does not constitute a trust for purposes of § 541(c)(2) does not end its analysis. In determining the issue presented under § 541(c)(2), the Court cannot disregard § 541(a) and § 542. Under § 541(a), property of the estate is defined broadly to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). Property of the estate, therefore, includes "all legally recognizable interests although they may be contingent and not subject to possession until some future time." *Leadbetter,* 1993 WL 141068 at *2 (internal quotation marks omitted);

*Booth,* 260 B.R. at 287 (holding that debtor's interest in profit-sharing plan and bonus payments to which the debtor might become entitled in the future were included in property of the debtor's estate). Thus, although Guikema is not currently entitled to a distribution from the VALIC Annuity, her right to receive a distribution from the VALIC Annuity in the future is property of her estate.

 This does not necessarily mean, however, that Rhiel is entitled to immediate turnover of Guikema's net account balance in the VALIC Annuity under § 542. Rhiel must prove that she has a present right to turnover. *See, e.g., Lawrence v. Chapter 7 Tr. (In re Lawrence),* 251 B.R. 630, 640 (S.D.Fla.2000) (" 'The burden of proof in a turnover proceeding is at all times on the receiver or trustee ....' ") (quoting *Evans v. Robbins,* 897 F.2d 966, 968 (8th Cir.1990)), *aff'd,* 279 F.3d 1294 (11th Cir.2002); *United States v. Chalmers (In re Wheeler),* 252 B.R. 420, 425 (W.D.Mich.2000) ("It is well established that the burden of proof is on the party seeking turnover of property of the estate[.]" (internal quotation marks omitted)); *In re Redman Oil Co.,* 95 B.R. 516, 521 (Bankr.S.D.Ohio 1988) ("The burden of proof in a turnover proceeding rests on the party seeking turnover.").

 Rhiel has not met this burden here. As the uncontroverted affidavits filed by VALIC show, Guikema is entitled to a distribution from the VALIC Annuity only when she becomes 59½ years old, separates from service with her employer, dies, becomes disabled or incurs a hardship.[19] Rhiel has not provided any evidence demonstrating that any of these events has occurred. In addition, although

---

19. It does not appear that insolvency or bankruptcy in and of itself constitutes hardship either under federal law or under the VALIC Annuity. Under federal law, a hardship distribution from a § 403(b) plan "is subject to

the rules and restrictions set forth in § 1.401(k)–1(d)(3) (including limiting the amount of a distribution in the case of hardship to the amount necessary to satisfy the hardship)." 26 C.F.R. § 1.403(b)–6(d)(2). A

Guikema has defaulted on a loan VALIC made to her, leaving an unpaid loan balance of $2,618.45, VALIC will not be able to recover this amount until one of the distributable events described above occurs. Rhiel has not contested these facts or put into evidence anything that would suggest that Guikema currently is entitled to a distribution from the VALIC Annuity.

 Rhiel succeeds to no greater rights in the property than Guikema possessed on the date she filed her bankruptcy petition. *See Demczyk v. Mutual Life Ins. Co. of New York (In re Graham Square, Inc.),* 126 F.3d 823, 831 (6th Cir. 1997) (trustee takes property of the estate "subject to the same restrictions that existed at the time the debtor filed the petition"). Subject to a trustee's authority "to enlarge the bankruptcy estate under 11 U.S.C. §§ 544, *et seq.,* the property interests which pass to the bankruptcy estate are no more extensive than those possessed by the debtor as of the date of filing." *In re Bardell,* 374 B.R. 588, 590 (N.D.W.Va.2007) (internal quotation marks omitted). *See also French v. Johnson (In re Coomer),* 375 B.R. 800, 806 (Bankr. N.D.Ohio 2007) ("Section 542(a) is best viewed as an enabling provision, allowing the trustee to obtain possession of property only where the debtor otherwise had a right to possess the property. But where a debtor, and thus the trustee, does not have a right to possess or use property at the commencement of the case, the right generally cannot be acquired through a turnover action under § 542(a)."); *Kovacs v. Sargent (In re Sargent),* 337 B.R. 661, 665 (Bankr.N.D.Ohio 2006) ("[M]erely because property is included in the estate[ ] does not confer upon the trustee any greater rights in the property than that held by the debtor.... Property limited in the hands of a debtor is similarly limited in the hands of the trustee." (citing *Graham Square,* 126 F.3d at 831)).

Courts in other jurisdictions have applied this legal principle. *See, e.g., Whitaker v. Power Brake Supply, Inc. (In re Olympia Holding Corp.),* 188 B.R. 287, 295 (M.D.Fla.1994) ("While the bankruptcy code protects the debtor's property rights to the extent that the debtor does not lose any property rights by declaring bankruptcy, the bankruptcy code does not provide the trustee any greater interest in the property than the debtor would have had outside the bankruptcy context."), *aff'd,* 68 F.3d 1304 (11th Cir.1995); *West v. Parker (In re Watson),* 325 B.R. 380, 387 (Bankr. S.D.Tex.2005) ("Since [the trustee] has stepped into the Debtor's shoes, [his] recovery on behalf of the Estate is so limited."); *Maxwell v. Megliola (In re marchFIRST, Inc.),* 288 B.R. 526, 530 (Bankr. N.D.Ill.2002) ("[F]iling a bankruptcy petition does not expand or change a debtor's interest in an asset; it merely changes the party who holds the interest." (internal quotation marks omitted)), *aff'd,* 293 B.R. 443 (N.D.Ill.2003); *Hollis v. State Employ-*

hardship distribution must be "made on account of an immediate and heavy financial need of the employee...." 26 C.F.R. § 1.401(k)–1 (d)(3). Moreover, "[t]he determination of the existence of an immediate and heavy financial need and of the amount necessary to meet the need must be made in accordance with nondiscriminatory and objective standards set forth in the plan." *Id.* The VALIC Annuity does not set forth any standards for determining the existence of a hardship. But federal law provides that a distribution "is deemed to be on account of an immediate and heavy financial need" only if the distribution is for certain medical care expenses, costs directly related to the purchase of a principal residence, the payment of certain tuition and related expenses, payments necessary to prevent the employee's eviction from the employee's principal residence or foreclosure on a mortgage on the residence, payments for certain burial or funeral expenses, or expenses for the repair of damage to the employee's principal residence. 26 C.F.R. § 1.401(k)–1(d)(3)(iii)(B).

*ees' Ret. Sys. of Illinois (In re Groves)*, 120 B.R. 956, 966 (Bankr.N.D.Ill.1990) ("[T]he court believes that the trustee has succeeded to exactly what the debtor had in terms of recovery of her contributions to SERS as of the date of the petition, i.e., a contingent right to the return of the money in the event the debtor's employment by the state is terminated.").

*Groves* is particularly instructive regarding the options available to a Chapter 7 trustee with an unmatured right to turnover of property of the estate. In *Groves,* no event had yet occurred that would have entitled the debtor to a distribution from her state employee retirement system

> The trustee can deal with that property interest in the same way she would deal with any property of the estate in a Chapter 7 case. She can keep the Chapter 7 case open and hold on to the contingent interest to see if it matures, i.e., to see if the debtor leaves her job with the state. If the debtor is no longer employed by the state, the trustee can require SERS to pay all of the debtor's prepetition SERS contributions to the bankruptcy estate.
>
> Alternatively, the trustee can sell what she has—the contingent right to a return of the SERS contributions payable only in the event the debtor leaves her job with the state—for whatever price the market will bid for such an asset. Finally, if the trustee cannot find a buyer for the contingent right to a return of the debtor's SERS contributions and the trustee would find it

unreasonably burdensome to keep the estate open to see if the debtor's employment by the state ends, the trustee can seek an order of this court authorizing her to abandon the contingent right to the SERS contributions. Such an abandonment would result in the right irrevocably revesting in the debtor. As a result, there is always the possibility that the debtor will gain a great windfall by quitting her state job and getting the contributions back the day after the trustee abandons the contingent right to recover the SERS contributions. However, the risk is no greater than the risk that attends any decision by a Chapter 7 trustee to seek court authority to abandon property of the estate. Events can always happen that would make the value of abandoned property increase after abandonment. If that happens, the debtor gets the benefit of the increase.

*Groves,* 120 B.R. at 966 (citations omitted) (footnote omitted); *see also Coomer,* 375 B.R. at 807 ("[F]or property such as [a] tax overpayment in which the debtor does not yet have, but will in the future obtain a possessory interest, a trustee is authorized to keep an estate open so as to allow that interest to vest."). The Court does not take a position on what an appropriate course of action would be here.[20]

## VII. Conclusion

For the foregoing reasons, the Court finds that, with respect to the adversary proceedings naming OhioHealth as a defendant, (1) Plaintiffs are not entitled to

---

**20.** The Court's determination that the Ohio-Health Plan Debtors may retain their retirement assets—because the funds in their § 403(b) plans are held in trust subject to an enforceable transfer restriction and thus do not constitute property of their bankruptcy estates—while the non-trust assets in Guikema's § 403(b) plan on the date she filed her bankruptcy petition are subject to turnover (albeit not immediately) will no doubt be per-

ceived by Guikema to be an unfair, or at the very least inconsistent, result. As Judge Latta noted in her dissenting opinion in *Adams,* "[o]utside the bankruptcy law, [there is] no functional distinction between the protections afforded to beneficiaries of ... pension plans in which assets are held in trust and those in which assets are used to purchase annuity contracts." *Adams,* 302 B.R. at 547. And as the *Adams* dissenting opinion also states, re-

judgment as a matter of law; and (2) OhioHealth is entitled to judgment as a matter of law. Therefore, Plaintiffs' summary judgment motions against Ohio-Health are **DENIED,** and OhioHealth's motions for summary judgment are **GRANTED.** The Court further finds that, with respect to the adversary proceeding naming VALIC as a defendant, Rhiel's motion for summary judgment is **GRANTED** in part and **DENIED** in part. Rhiel's summary judgment motion is **GRANTED** insofar as it seeks a determination that Guikema's interest in the VALIC Annuity is property of her bankruptcy estate and **DENIED** insofar as it seeks a judgment requiring immediate turnover of Guikema's interest in the VALIC Annuity.

Separate judgment entries in accordance with this memorandum opinion will be entered.

**IT IS SO ORDERED.**

gardless of whether assets in a debtor's § 403(b) plan are held in trust, "[o]utside of bankruptcy, no creditor ... would be able to reach the debtors' beneficial interests in their pension plans to satisfy claims.... The filing of a bankruptcy case should not change this result." *Id.* (citation omitted). Like Judge Latta, the Court can conceive of no sound policy justification for requiring "the presence of an express trust ... to exclude [a] retirement plan from the assets of a bankruptcy estate...." *Id.* at 546. But as the *Adams* majority points out, courts are not free to substitute their policy judgments for those made by Congress. *Id.* at 545–46 ("[C]ourts simply do not have the power to resolve pure policy questions. This is especially true when it comes to rewriting statutes with the intention of improving them."). *See also Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.,* 489 U.S. 468, 487 n. 8, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) (Brennan, J., dissenting) ("[W]e are not free to substitute our notions of good policy for federal law as

currently written."); *United States v. Robinson,* 361 U.S. 220, 229, 80 S.Ct. 282, 4 L.Ed.2d 259 (1960) ("[P]olicy question[s], involving as [they] do[ ], many weighty and conflicting considerations, must be resolved through the [legislative] process and not by judicial decision."). In concluding the *Adams* decision, the majority noted that "if there are to be any changes in the language of § 541(c)(2) such changes must be made by Congress, not by the courts." *Adams,* 302 B.R. at 546. With the 2005 amendments to the Bankruptcy Code, Congress did indeed change the language of § 541, broadening the protection afforded to retirement assets by expressly excluding from a debtor's bankruptcy estate "any amount ... withheld by an employer from the wages of employees for payment as contributions ... to ... a tax-deferred annuity under section 403(b) of the Internal Revenue Code of 1986...." 11 U.S.C. § 541(b)(7)(A)(i)(III). Regrettably, this change in the law came too late for Guikema.